C. Peter R. Gossels *vs.* Fleet National Bank.

No. 05-P-1796.

Suffolk. October 10, 2006. - August 22, 2007.

Present: Greenberg, Smith, & Gelinas, JJ.[1]

*Contract*, Performance and breach. *Uniform Commercial Code,* Payment on negotiable instrument. *Bank. Agency,* Liability of agent. *Conversion. Negligence,* Misrepresentation. *Consumer Protection Act,* Bank. *Damages,* Negligent misrepresentation.

The judge in a civil action properly treated a claim arising from a bank's processing of a check drawn in a foreign currency as one sounding in tort, where the question posed by the claim was more whether the bank had committed a breach of its duty of care as the plaintiff's agent for collection than whether the bank had committed a breach of contract as embodied in a receipt given to the plaintiff, and where the parties impliedly consented to trial of the issue as one of breach of the duty of reasonable care and good faith as well as negligent misrepresentation. [801-805]

Evidence in a civil action was sufficient to warrant a finding of liability for losses caused by the defendant bank's negligent misrepresentation regarding the collection and payment of an international check that the plaintiff had presented, where the defendant gave the plaintiff a receipt containing partial, vague representations regarding the deduction of service charges, despite its affirmative obligation to disclose all material facts bearing on the amounts it would retain for itself, including the differential rates it would employ to realize a hefty profit, that it gave only dollars and not euros, and whether the bank was accepting the check for provisional credit or for collection only [805-809]; however, the judge should have calculated damages by using the amount the plaintiff would have received on the date of the transaction, if he had been given provisional credit and if the check had been properly processed, in accordance with the spot rate at the correspondent bank in Germany, less the service charge it made and the defendant bank's collection fee [809-810].

In a civil action, the defendant bank knowingly and purposefully deprived the

[1]The case was originally heard by a panel comprised of Justices Greenberg, Smith, and Gelinas. Justice Greenberg participated in the deliberation on the case prior to his retirement. Following issuance of the panel's opinion and Justice Greenberg's retirement, the parties filed petitions for rehearing. Justice Cypher was then substituted on the panel for Justice Greenberg, and upon consideration of the petitions for rehearing the new panel ordered revisions now incorporated in the opinion.

plaintiff of the full proceeds of an international check that he had presented, and thereby committed the tort of conversion, where the bank failed to disclose all material facts regarding the amounts it would retain from the proceeds of the plaintiff's check based on its internal retail rate sheet and, upon inquiry by the plaintiff, failed either to account for the funds or to restore them to his account. [810-813]

The judge in a civil action erred in concluding that the defendant bank had not committed an unfair and deceptive act or practice in violation of G. L. c. 93A with regard to the processing of a check that the plaintiff had presented that was drawn in a foreign currency, where the bank purposely withheld information from the plaintiff by not revealing a rate differential, arising from an internal rate sheet, that the bank would apply in processing the check. [813-814]

CIVIL ACTION commenced in the Central Division of the Boston Municipal Court Department on October 4, 2001.

The case was heard by *Sally A. Kelly*, J.

*C. Peter R. Gossels*, pro se.

*Michael C. Gilleran* for the defendant.

GELINAS, J. The plaintiff C. Peter R. Gossels filed a complaint in the Boston Municipal Court against the defendant Fleet National Bank[2] (Fleet), claiming breach of contract, conversion, and violation of G. L. c. 93A, arising from Fleet's processing of a check, drawn in a foreign currency, that Gossels presented to Fleet. He later amended the complaint to add a fourth count essentially alleging that Fleet failed to follow the provisions of G. L. c. 106, § 3-107. Following a bench trial, the trial judge found that Fleet was liable for negligent misrepresentation,[3] resulting in damages of $6,861.68. The trial judge explicitly found for Fleet on the G. L. c. 93A claim. The judge ruled that Fleet's check collection practices were in compliance with G. L. c. 106, § 3-107. The judge made no mention of the breach of contract or conversion counts in her memorandum of decision. Judgment entered for Gossels on the breach of contract count

[2]We employ the name Fleet National Bank although through acquisition and merger the name no longer is used. No substitution of party appears in the record.

[3]The trial judge specifically found that "Fleet negligently misrepresented the terms by which the check would be collected and the denomination of the funds that would be credited to Gossels'[s] account" (footnote omitted). Gossels did not specifically allege a negligent misrepresentation count in his complaint.

(but only "insofar as it alleges [n]egligent [m]isrepresentation"), and for Fleet on the remaining counts.

On appeal, the Appellate Division of the Boston Municipal Court affirmed. Both Gossels and Fleet appeal to this court.

The facts as found by the trial judge are uncontested. Gossels received a check from the German government for 85,071.19 euros, drawn on Dresdner Bank of Germany.[4] On October 15, 1999, he took the check to a branch of Fleet at 75 State Street in Boston and presented it to the international teller. Gossels, an account holder at Fleet, did not request that the euros be exchanged for dollars.

At this point, the international teller failed to inform Gossels either that Fleet could pay Gossels only in dollars, or that Fleet paid international checks at a "retail exchange rate" several percentage points lower than the interbank "spot rate" for foreign currency. Had Gossels known this information, he would have taken the check to another bank.[5]

As Gossels started to endorse the check, the international teller also incorrectly instructed Gossels not to endorse the check, stating that no endorsement was required for checks drawn on a foreign bank.

The teller then took the check and gave Gossels a preprinted receipt, which we see, from the copy in the record appendix, was entitled "Foreign/Domestic Non Cash Collection Receipt"; in so doing, the teller did not check either of two mutually exclusive options on the form, the first box indicating that "provisional credit" would be given to Gossels, the other indicating that the check was accepted for "collection only." The judge found that if Fleet had given Gossels provisional credit for the check, then the funds in dollars would have been credited

---

[4]This check was a payment in reparation for the seizure by the Third Reich of property belonging to Gossels's family.

[5]The trial judge "credit[ed] the testimony of Gossels that if he had known that Fleet intended to give him dollars instead of euros, he would have declined to give the check to Fleet and would have taken it to another bank." The trial judge also "credited the testimony of Gossels that . . . he asked [the teller] to collect the total amount of the check in euros." The record contains no testimony regarding this latter point.

to Gossels on or shortly after October 15, 1999.[6] If the check was accepted for collection only, that would have resulted in a delay of credit pending Fleet's receipt of payment by the drawee bank of the amount of the check.[7]

From the record appendix, we also note that the receipt handed to Gossels, which Gossels signed and dated, contained the following statement: "I understand that Fleet Bank is acting as an agent for collection on my behalf according to the terms spelled out on the verso." The reverse side of the receipt provided, among other things, that "Fleet National Bank will act in good faith and exercise reasonable care to collect the check(s) or other financial documents." The reverse side of the receipt also stated that "[f]oreign bank fees and Fleet service charges are deducted from proceeds."

Fleet maintains for teller instruction a manual of foreign check collection practices. The manual instructed tellers to inform the customer that receipt of payment by a customer for a foreign check would take four to six weeks, and that an exchange rate would be applied, based on the date of Fleet's receipt of the funds from the foreign bank. Moreover, the manual instructed tellers to advise the customer of the approximate date on which the exchange rate would be determined. The international teller in this case failed to provide Gossels with any of this information.

Fleet, as collecting bank, sent the check to its global collection department, which sent it with a collection letter dated October 20, 1999, to Fleet's foreign correspondent bank in Germany, Deutsche Bank. On November 1, 1999, Gossels received a notice from Fleet that the check had been returned unpaid because it lacked an endorsement.[8] Gossels immediately

---

[6]We observe from the copy in the record appendix that next to the "provisional credit" option on the receipt handed to Gossels were blank spaces for indicating the rate, fees, and credit amount. Nothing was written in these spaces, however. The back of the receipt stated that "Provisional Credit payments are subject to final collection. Foreign bank fees and Fleet service charges are deducted from proceeds."

[7]The "collection only" option on the copy of the receipt in the record appendix states in parentheses, "Rate and fees determined at time of settlement."

[8]Deutsche Bank had attempted to collect the funds by logging the check into its system and mailing the check to Dresdner Bank. After failing to receive a guaranty from Fleet in lieu of Gossels's endorsement, Dresdner Bank returned the check unpaid.

walked to the Fleet branch at 75 State Street in Boston and told the manager that the international teller had instructed him not to endorse the check. The manager asked Gossels to endorse the check, credited his account for $38.25 in lost interest,[9] and waived the $30.00 fee that Fleet had charged Gossels for failing to endorse the check. After Fleet and Deutsche Bank repeated the collection process with the check, which now bore Gossels's endorsement, Dresdner Bank debited the funds from the appropriate account and sent 85,071.19 euros to Deutsche Bank, which (apparently on December 14 or 15, 1999) credited 84,971.19 euros to Fleet's account at Deutsche Bank (100 euros having been deducted as a collection fee).

On December 15, 1999, Gossels received notice from Fleet that it had credited his account with check proceeds in the amount of $81,754.77, which was based on the December 15, 1999, retail exchange rate offered by Fleet for 84,971.19 euros. The same number of euros would have been worth $88,616.45 based on the October 15, 1999, retail exchange rate offered by Fleet, or $92,023.80 based on the October 15, 1999, spot rate offered by Dresdner Bank.[10]

After further communication, and a complaint to the Massachusetts Attorney General, on September 22, 2000, Gossels sent Fleet a thirty-day demand letter under G. L. c. 93A, § 9(3). Fleet did not respond.

Gossels then initiated the suit that is the subject of this appeal.

*Contract claim.* We first address Gossels's argument that the trial judge erred in failing to find that Fleet was in breach of its contract with him with respect to the check.

---

[9]Although not clear from the record, it appears that this was the amount of interest that would have been earned to that date had Fleet accepted the check on a "provisional credit" basis.

[10]The October 15, 1999, Fleet retail exchange rate for checks under $100,000 was $1.0429 per euro. The October 15, 1999, Dresdner Bank spot rate was $1.0830. In line 16 of its answer, Fleet "[a]dmitted that Fleet collected $84,971.19 in Euros [*sic*] and did not credit the Euros to Gossels['s] account but instead converted the Euros to Dollars at the then exchange rate for non-interbank transfers of *more [sic] than $1 million.* Further answering, Fleet says that the spot rate is only generally available for interbank transfers of more than $1 million." (Emphasis added.) The first use of the phrase "more than $1 million" in an apparent typographical error notwithstanding, the rate used by Fleet was for interbank transfers of less than $1 million.

Gossels appears to base his contract claim on the terms set forth in the preprinted receipt he was given by the bank's teller, in particular, that the bank would act in good faith in collecting the check. The bank's obligations in handling Gossels's check arose pursuant to the terms of the Uniform Commercial Code (code)[11] applicable to the transaction, which provided that Fleet became Gossels's agent when he passed the check to Fleet, and Fleet accepted the check, for collection. See G. L. c. 106, § 4-201(*a*). The receipt the bank gave to Gossels when it accepted the check for collection confirmed that relationship, by declaring that the bank was "an agent for collection on [Gossels's] behalf," and reiterating the requisite duty of care. Nothing in the evidence suggests that either party had a contrary intent. "Unless a contrary intent clearly appears and before the time that a settlement given by a collecting bank for an item is or becomes final, the bank, with respect to the item, is an agent or subagent of the owner of the item . . . . This provision applies regardless of the form of indorsement or lack of indorsement . . . ." *Ibid.* Whether Fleet, as the depositary bank, accepted the check for provisional credit to Gossels's account, or merely took the check for collection, Fleet was performing as a collecting bank. See G. L. c. 106, § 4-105(5). See also Official Comment 4 to Uniform Commercial Code § 4-201, 2B U.L.A. 46-47 (Master ed. 2002). We conclude that the trial judge was correct to treat the action under the theory of a tort claim.

In the first count of his complaint, Gossels alleged that "Fleet breached its Agreement with Gossels by failing to 'act in good faith' to collect the euro proceeds from the check that it had accepted from Gossels . . . ." We think this count, and the supporting factual material in the complaint incorporated by reference, was a sufficient pleading that Gossels is entitled to relief against Fleet for breach of its duty of reasonable care and good faith to Gossels as his agent for the collection of the instrument. In most cases, breach of a duty of care is a tort, and not a breach of contract. See *Anthony's Pier Four, Inc.* v. *Crandall Dry Dock Engrs., Inc.*, 396 Mass. 818, 822-823 (1986); *Her-*

---

[11]All citations in this opinion to provisions of article 3 and 4 of the code are to those appearing in St. 1998, c. 24, § 8.

*bert A. Sullivan, Inc.* v. *Utica Mut. Ins. Co.*, 439 Mass. 387, 395-396 (2003); *Melrose Hous. Authy.* v. *New Hampshire Ins. Co.*, 24 Mass. App. Ct. 207, 211 n.5 (1987). The usual argument, absent here, is whether a contract or a tort period of limitations is applicable to the action, and in those circumstances, we look to the "gist" of the action to make that determination. See, e.g., *Anthony's Pier Four, Inc.* v. *Crandall Dry Dock Engrs., Inc.*, 396 Mass. at 823. The fact that, as here, the relationship is established primarily by statute rather than by agreement, further supports the view that the claim is one of tort and not of contract. Compare *Kirley* v. *Kirley*, 25 Mass. App. Ct. 651, 653 (1988).

As the code dictates, Gossels was the principal in the transaction. "In those cases where some period of time elapses between the final payment of the item by the payor bank and the time that the settlement of the collecting bank is or becomes final, . . . the continuance of the agency status of the collecting bank necessarily carries with it the continuance of the owner's status as principal." Official Comment 5 to Uniform Commercial Code § 4-201, 2B U.L.A. 47 (Master ed. 2002).

Fleet, as agent under § 4-201, was not a general agent, the agency status being limited to collecting items. See *United States for Use & Benefit of Westinghouse Elec. Corp.* v. *Sommer Corp.*, 580 F.2d 179, 183 (5th Cir. 1978) (*Westinghouse*). See also Official Comment 1 to Uniform Commercial Code § 4-201, 2B U.L.A. 45 (Master ed. 2002) (section 4-201 was placed in code to govern risk of loss of item while being collected; agency status of § 4-201 is limited to that of "agent for collection"). For example, a collecting bank is not the sort of agent whose knowledge of collateral facts is imputed to the owner of the collection item. See *Westinghouse*, *supra*, citing 3 R. Anderson, Uniform Commercial Code § 4-201:1-9 (2d ed. 1971). The bank's duties as agent include presenting the item or sending it for presentment, notifying its transferor of nonpayment or dishonor, and settling with the principal when it receives final payment. *Westinghouse*, *supra*.

The code specifies that the collecting bank, as agent, is held to the standard of ordinary care in carrying out the basic tasks

involved in collection. See G. L. c. 106, § 4-202[12]; Official Comment 1 to Uniform Commercial Code § 4-202, 2B U.L.A. 49 (Master ed. 2002). See also G. L. c. 106, § 1-203 (imposing obligation of good faith). The code also recognizes that the bank's liability for its collection activities is governed by the law of the place where the bank is located. See G. L. c. 106, § 4-102(*b*).[13] The preprinted receipt supplied to Gossels here provided that the bank would act in good faith and exercise reasonable care in acting as his agent for collection.

Accordingly, in accepting the check for collection, whether or not provisional credit was given, and within the scope of its agency, Fleet became bound to perform in good faith and to exercise reasonable care in conducting itself as an agent for Gossels, its principal, as that standard is construed under the laws of the Commonwealth. Thus, the question posed by Gossels's contract claim was more whether the bank had committed a breach of its duty of care as Gossels's agent for collection, than whether the bank had committed a breach of the contract as embodied in the receipt. For that reason, the judge appropriately treated count I of the plaintiff's complaint as sounding in tort.

We also concur with the trial judge in her finding that the parties had impliedly assented to try the case on the basis of negligent misrepresentation. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be

---

[12]The section provides in relevant part, "(a) A collecting bank must exercise ordinary care in: (1) presenting an item or sending it for presentment; (2) sending notice of dishonor or nonpayment or returning an item other than a documentary draft to the bank's transferor after learning that the item has not been paid or accepted, as the case may be; (3) settling for an item when the bank receives final settlement; and (4) notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof." G. L. c. 106, § 4-202.

[13]Section 4-102(*b*) states that:

"[t]he liability of a bank for action or nonaction with respect to an item handled by it for purposes of presentment, payment, or collection is governed by the law of the place where the bank is located. In the case of action or nonaction by or at a branch or separate office of a bank, its liability is governed by the law of the place where the branch or separate office is located."

necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues." Mass.R.Civ.P. 15(b), 365 Mass. 761 (1974). See *Jensen* v. *Daniels*, 57 Mass. App. Ct. 811, 815-816 (2003). Issues tried by express or implied consent of the parties are treated as raised in the pleadings "without regard to whether the pleadings are amended to conform to the evidence." *National Med. Care, Inc.* v. *Zigelbaum*, 18 Mass. App. Ct. 570, 579 (1984). Here, we conclude that the parties impliedly consented to try the issue of the bank's performance of its collection duties as negligent misrepresentation. Neither party objected to evidence with respect to the representations made by the bank's personnel, and neither party raised the point in any posttrial proceedings before the trial court. Further, Gossels's claim under G. L. c. 93A sets out all of the elements of the tort, and expressly alleges the misrepresentation of material factual information. We consider the appeal on this basis.

*Negligent misrepresentation.* Turning to the merits of Gossels's negligence claim, the evidence fully supported the judge's conclusion that the bank was liable for Gossels's losses caused by its negligent misrepresentations regarding the collection and payment of his check. The judge focused on the teller's misrepresentations concerning the need for endorsement and method of payment. But from the documentary record and the undisputed facts, and as further alleged and incorporated by reference in Gossels's count for violation of G. L. c. 93A, it is apparent that Fleet's misrepresentations went considerably further.

In its defense, Fleet presses the representations it made on the reverse side of the receipt it provided to Gossels as establishing the standard for its duty of care, that being good faith and reasonable care, and we agree. But the very same receipt also informed Gossels that "Fleet service charges" would be deducted from the proceeds. By indicating that it would deduct Fleet service charges from amounts it collected on Gossels's behalf, Fleet undertook the affirmative obligation, in these circumstances, to disclose all material facts bearing on any other amounts it would retain for itself from the check proceeds.

As noted, liability for the bank's breach of its duty of good faith and reasonable care is determined by reference to the laws of Massachusetts, where the Fleet branch utilized by Gossels was located. See G. L. c. 106, § 4-102(*b*). With respect to the bank's conduct here, the law is well-settled. "[A]lthough '[t]he rule of nonliabilty for bare nondisclosure has been stated and followed' for years, see *Swinton* v. *Whitinsville Sav. Bank*, 311 Mass. 677, 679 (1942), that rule has long been tempered with an exception for 'the uttering of a half truth which may be tantamount to a falsehood." *Id.* at 678. *Golber* v. *BayBank Valley Trust Co.*, 46 Mass. App. Ct. 256, 258 (1999).

> "Although there may be 'no duty imposed upon one party to a transaction to speak for the information of the other . . . if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his knowledge. Fragmentary information may be as misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies.' "

*Ibid.*, quoting from *Kannavos* v. *Annino*, 356 Mass. 42, 48 (1969).

We think the bank's conduct, utilizing an innocuous and vague reference to the deduction of Fleet service charges, while omitting any reference to the differential rates it would employ to derive a hefty profit at Gossels's expense, was a clear breach of the bank's duty of good faith and reasonable care as Gossels's agent for collection. In accordance with the code, the bank's own preprinted receipt, and Massachusetts negligence law, see generally *Kannavos* v. *Annino, supra,* and cases cited, Fleet was obliged to perform its collection duties in good faith and with reasonable care, and to disclose all material facts bearing on amounts it would retain for itself from the proceeds of Gossels's check. From the judge's findings and from the undisputed facts, it is evident that Fleet did not meet this standard.

First, as the judge found, Fleet's teller informed Gossels that his endorsement would not be required for collection of the check,

and then sent the check for collection without the endorsement.[14] We conclude that this action on Fleet's part was a violation of the requisite standard of care due Gossels under G. L. c. 106, § 4-202(a)(1), the requirement that Fleet use ordinary care in "presenting an item or sending it for presentment," and under the good faith and reasonable care standard set out in the receipt.

Additionally, as the judge found, Fleet committed a breach of its duty as an agent for collection when the teller failed to disclose not only that the collection would be in dollars and not in euros, but also when she failed to inform Gossels whether the bank was accepting the check for provisional credit or for collection only. The breach was compounded by the teller's failure to disclose other elements of the transaction, all set out in the instruction manual prepared for teller use with transactions of this nature, which the teller either ignored or of which the teller was ignorant.[15]

While all of the above might be ascribed to the simple negligence of the teller in handling the transaction (thus justifying the trial judge in her finding against Gossels on his claim under G. L. c. 93A), it is of greater concern that Fleet was required, in accordance with the partial representations in the receipt it handed to Gossels regarding its service charges, to disclose all material facts bearing on amounts it would deduct for itself from the check proceeds. This included advising Gossels that it would pay his international check at a retail exchange rate that was several percentage points lower than the spot rate it received for foreign currency.[16] With respect to this aspect of the transaction, the trial judge found that Fleet "did [not] explain

---

[14]Nothing in the record suggests why the teller would give Gossels such advice, or whether the teller sought information from superiors concerning what is common and elementary procedure in the cashing and collection of checks.

[15]As noted, there is no evidence to support the trial judge's finding that Gossels requested payment in euros. According to the bank's manual, the teller was under obligation to advise Gossels in this regard, and failed to so do; there was no need for Gossels to have made his wishes known. As well, the failure to advise Gossels of all material facts bearing on the conversion from euros to dollars was a breach of the bank's duty of good faith and reasonable care.

[16]We hasten to add that nothing prevents the bank from using a retail exchange rate lower than the spot rate available on the day of collection or the interbank rate used between banks; the issue here is strictly one of the disclosure a collecting bank, as agent, owes its principal, under the duty of reasonable

the terms of the exchange rate." Nowhere in the transaction did Fleet reveal that it would pay Gossels a retail rate of exchange substantially less than the spot rate it obtained for the item, which former rate was set out daily on an internal rate sheet that bank employees were advised not to disclose to the public, and that it would profit by effectively keeping the difference. While the bank may argue that it was impossible to advise Gossels of the actual rate of exchange, dependent as that information was on the rate when the check was actually put before the payor bank, Fleet was obligated to disclose the material fact that it would pay Gossels something less than the spot rate, whatever that might be, and pocket the difference.[17]

Nor do we think it a defense to Fleet's failure to disclose all material facts bearing on its charges and profits that Gossels did not pursue, with vigilance and attention, either the matter of the currency in which the check would be paid or the rate differential that might apply, especially as the rate sheet was to be kept secret from customers. Having volunteered the partial information that it would deduct Fleet service charges, the duty to disclose all material facts bearing on amounts it would take for itself from the check proceeds was on Fleet.

Further, after payment of the item, when Gossels did question the rate and the transaction, Fleet once again failed to provide such detail of the transaction and the charges and profit to be deducted from the check proceeds that good faith would require of a collecting bank. See, e.g., *Golber* v. *BayBank Valley Trust Co.*, 46 Mass. App. Ct. at 260 (once customer expressed concern about a given matter affecting her investment, "the bank was not at liberty to provide misleading information"). Instead, Fleet informed Gossels by letter that he was not being "shortchanged" and that the spot rates Gossels had cited were for "Interbank use, not for consumer exchange. [We] can assure you that the rate of exchange used in this matter is fair." By failing to disclose its

care and good faith, with respect to the terms of the transaction (and the principal's agreement to those terms).

[17]There can be no legitimate dispute that the differential between the rates here was material, and not a mere transactional charge. See and contrast *Press* v. *Chemical Inv. Servs. Corp.*, 166 F.3d 529, 532-536 (2d Cir. 1999) (broker need not disclose $158.86 markup on six-month Treasury bill sold for $99,488.42 with maturity value of $102,000).

deductions, and by withholding the amount without giving Gossels an adequate explanation, Fleet further violated its duty of good faith and reasonable care to give a complete explanation of the disposition of the funds, including the profit gained by Fleet out of the check proceeds as the result of its application of a rate differential.

On appeal, Fleet does not question the judge's decision to treat the case as one involving negligent misrepresentation, despite its not being expressly pleaded. Fleet argues here, as it did before the Appellate Division, only that the evidence was insufficient to warrant a finding of negligent misrepresentation, especially with respect to the judge's finding that Gossels requested that Fleet pay the check proceeds to him in euros. While it is true that the evidence does not support the judge's finding that Gossels requested the payment of the check in euros, this was not the only basis of the negligent misrepresentations. The judge found, correctly in our view, that Fleet "had an obligation to inform Gossels whether Fleet was accepting the check for 'provisional credit' or for 'collection only.' Fleet also had an obligation to inform Gossels that Fleet gave only dollars and not euros," and did not so inform him. And from the bare references provided in the receipt, Gossels had no way of knowing, without further explanation, that Fleet would essentially charge him several thousands of dollars from the proceeds of his check.[18] In these circumstances, good faith and reasonable care required Fleet to disclose all material facts concerning those amounts. Fleet compounded its breach of duty to Gossels in April, 2000, when it refused to explain the bank's conduct or to account to Gossels for the precise disposition of the funds.

Based on the foregoing, we will not disturb the trial judge's finding and ruling that Fleet was liable on a theory of negligent misrepresentation.

*Conversion claim.* Gossels also claims on appeal that the trial

---

[18]It does not avail Fleet that the language "[r]ate and fees determined at time of settlement" appeared parenthetically next to the "collection only" option on the front of the receipt, as the judge found that the bank failed to inform Gossels which option applied to his check. In any event, we would not view that parenthetical as satisfying Fleet's duty to disclose the rate differential that cost Gossels several thousands of dollars from the proceeds of his check.

court committed error in not finding for him on count II of his complaint, alleging that Fleet had converted his funds to its use.

"The elements of conversion require that a defendant be proved to have 'intentionally or wrongfully exercise[d] acts of ownership, control or dominion over personal property to which he has no right of possession at the time . . . .' " *Grand Pac. Fin. Corp.* v. *Brauer*, 57 Mass. App. Ct. 407, 412 (2003), quoting from *Abington Natl. Bank* v. *Ashwood Homes, Inc.*, 19 Mass. App. Ct. 503, 507 (1985). Again, the receipt given to Gossels when Fleet took his check contained a statement representing that Fleet service charges would be deducted from the check proceeds. We have concluded that this partial representation obligated Fleet to disclose all material facts bearing on the amounts it would deduct from the check proceeds, in particular, that its arbitrage of the exchange rate would cost Gossels thousands of dollars. The record establishes that failure to disclose this rate differential was not mere negligence or oversight; the rate sheet was published internally with instructions that it was not to be revealed to the public, which included Gossels, its own customer and, for purposes of collection, its principal.

The undisputed evidence showed that Fleet failed to disclose all material facts regarding the amounts it would retain from the proceeds of Gossels' check based on its retail rate sheet differential and, upon inquiry by Gossels, failed either to account for the funds or to restore them to his account. As such, we conclude that Fleet knowingly and purposefully deprived Gossels of the full proceeds of his check, money that, in these circumstances, properly belonged to Gossels, and thereby committed the tort of conversion, as a matter of law. See *Third Natl. Bank of Hampden County* v. *Continental Ins. Co.*, 388 Mass. 240, 244 (1983) (conversion requires exercise of dominion or control over personal property of another); Restatement (Second) of Torts § 222A (1965).

*Chapter 93A claim.* On appeal, Gossels further argues that the trial judge erred denying his claim under G. L. c. 93A. Fleet responds that its actions could not amount to a violation of the statute. The trial judge found against Gossels on the c. 93A claim because "the teller's failure . . . was simply negligent,

and therefore, neither deceptive nor unfair within the meaning of G. L. c. 93A." The Appellate Division affirmed, ruling that "Fleet's conduct was 'neither deceptive nor unfair within the meaning of G. L. c. 93A.' The conduct did not rise to the level of 'immoral, unethical, oppressive or unscrupulous' conduct that is necessary for a G. L. c. 93A violation." Having found that there was no violation of c. 93A, the trial judge never reached the issue whether Fleet had responded to Gossels's demand letter.

Given our conclusion that Fleet was in breach of its duty to disclose all material facts to Gossels bearing on amounts it would deduct for itself from the check proceeds, especially as regards the disclosure of the exchange rate differential, we conclude as well that it was error to find no unfair or deceptive acts or practices occurred under c. 93A. On our review, the judge's findings, together with the undisputed facts and the documentary record, established that the bank's conduct toward Gossels was unfair or deceptive, as a matter of law. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 476 (1991).

"Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, . . . the boundaries of what may qualify for consideration as a c. 93A violation is a question of law." *Schwanbeck* v. *Federal-Mogul Corp.*, 31 Mass. App. Ct. 390, 414 (1991). General Laws c. 93A, § 2(*a*), inserted by St. 1967, c. 813, § 1, declares unlawful any "unfair or deceptive acts or practices in the conduct of any trade or commerce." Liability under G. L. c. 93A, § 9, requires two elements: the conduct must be an unfair or deceptive act or practice, and the act or practice must be a foreseeable cause of injury to the plaintiff. See *Lord* v. *Commercial Union Ins. Co.*, 60 Mass. App. Ct. 309, 317 (2004). See also *Aquino* v. *Pacesetter Adjustment Co.*, 416 F. Supp. 2d 181, 192 (D. Mass. 2005).

Here, Fleet made negligent misrepresentations and committed a breach of its duty of good faith and reasonable care to Gossels through its teller, in the initial instance, by neglecting the requirement of an endorsement on the check, in failing to disclose that the money would be collected in dollars and not in euros, and in failing to indicate whether the collection was for provisional credit or for collection only. As well, the teller and

then Fleet's other officers failed to disclose amounts it would deduct for itself from the check proceeds, in particular the rate differential the bank would pay based on its internal rate sheet. And, after Gossels began to press for information, Fleet continually attempted to assure Gossels that he had been treated fairly, but without revealing the details of the rate sheet differential or of other aspects of the transaction. Moreover, in the initial instance, the teller failed to follow the instruction sheet specially prepared and made available to Fleet tellers with respect to international checks.

"[A] negligent misrepresentation of fact the truth of which is reasonably capable of ascertainment is an unfair and deceptive act or practice within the meaning of c. 93A, § 2(*a*)." *Glickman* v. *Brown*, 21 Mass. App. Ct. 229, 235 (1985). As in the *Glickman* case, Fleet was obviously in a better position to know the conditions of the transaction, and "should not be allowed to misrepresent the truth simply because [it has] not made reasonable efforts to ascertain it." *Ibid.* See *Berenson* v. *National Fin. Servs., LLC*, 403 F. Supp. 2d 133, 148-152 (D. Mass. 2005) (holding financial institution potentially liable under G. L. c. 93A for depriving customers of "lost opportunity to earn interest"); *Briggs* v. *Carol Cars, Inc.*, 407 Mass. 391, 396-397 (1990) (holding car salesman liable under G. L. c. 93A, § 9, where misrepresentation of fact was reckless, though in nature of opinion); *Golber* v. *BayBank Valley Trust Co.*, 46 Mass. App. Ct. at 261 (negligent misrepresentation of fact, the truth of which is reasonably capable of ascertainment, is an unfair and deceptive act or practice within the meaning of c. 93A, § 2[*a*]). This is especially true where Fleet volunteered that it would deduct service charges from the check proceeds, but purposely withheld information from Gossels by not revealing the rate differential, arising from its use of the internal rate sheet, by which the bank would acquire, at Gossels's expense, thousands of dollars in crediting the check proceeds to Gossels's account. See *Grossman* v. *Waltham Chem. Co.*, 14 Mass. App. Ct. 932, 933 (1982) (failure to disclose fact, the disclosure of which may have influenced a person not to enter into a transaction, is a violation of c. 93A).

Fleet's conduct was unfair and deceptive in these circum-

stances. The record establishes that failure to disclose the rate differential was not mere negligence or oversight; the rate sheet was published internally with instructions that it was not to be revealed to the public. We think it significant, as well, that it appears to have been the bank's practice not to reveal this information to its customers, even those for whom it served as collecting agent. Intentional nondisclosure of material facts may be found to be a wilful and knowing violation of c. 93A making appropriate an award of multiple damages. See *Grossman* v. *Waltham Chem. Co.*, 14 Mass. App. Ct. at 934. Taken as a whole, the evidence here tends to point in that direction. Compare, e.g., *Kannavos* v. *Annino*, 356 Mass. at 49 (sellers advertised properties as apartment buildings, while failing to disclose that properties were not zoned for multifamily dwellings; conduct was intentionally deceptive and fraudulent). We leave that determination, however, to the trial judge, as fact finder. Contrast *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. at 475-476.[19]

*Damages.* Based on her finding of negligent misrepresentation, the trial judge found that Gossels had been damaged in the amount of $6,861.68, the difference between what the bank paid Gossels on December 15, 1999, and the amount he would have received on October 15, 1999, using Fleet's internal retail rate sheet for that day, if he had been given provisional credit and had the check been properly processed.[20] Gossels argues, and we agree, that the rate used should have been the spot rate for the latter date, and not the undisclosed, unagreed-to rate Fleet withheld from the public and its customers. Absent an agreement to the contrary, see G. L. c. 106, § 4-103(*a*), the collecting bank, as agent, is responsible for paying to the principal the full amount of the proceeds obtained in the transaction. See

[19]Our conclusion that the bank's conduct constituted a conversion of Gossels's funds, as a matter of law, does not necessarily translate to a wilful and knowing violation of c. 93A, as conversion does not require a showing of the kind of intentional unfairness or deception that warrant c. 93A sanctions, or that the misrepresentations be tantamount to a deliberate fraud. See *VMark Software, Inc.* v. *EMC Corp.*, 37 Mass. App. Ct. 610, 622-624 (1994). See also *Squeri* v. *McCarrick*, 32 Mass. App. Ct. 203, 206-207 & n.10 (1992).

[20]Neither party has challenged the trial judge's use of the October 15, 1999, provisional credit date rather than October 21, 1999, when final collection would apparently have occurred if Gossels had endorsed the check on October 15.

*Mackey* v. *Rootes Motors Inc.*, 348 Mass. 464, 467-468 (1965); *Newton* v. *Moffie*, 13 Mass. App. Ct. 462, 469 n.9 (1982); Restatement (Second) of Agency §§ 39, 387, 388 (1958). Here, in accordance with G. L. c. 106, § 3-107,[21] the check was payable at the Dresdner Bank either in euros or in dollars at "the current bank-offered spot rate at the place of payment for the purchase of dollars on the day on which the instrument is paid." Because Fleet had not disclosed all material facts concerning the amounts it would deduct for itself from the check proceeds, including the rate at which it would pay him, there could be no agreement with respect to a different rate that would be paid to Gossels, had the check been properly processed by Fleet. Fleet therefore would have been obligated to pay Gossels in accordance with the spot rate at Dresdner Bank on October 15, less the service charges made by the correspondent bank and Fleet. So calculated, the difference between what Fleet should have paid Gossels and what it did pay him was $10,269.03.

Fleet argues that when the check was presented for provisional credit or for collection Fleet would have no way of knowing what the spot rate would be on the date, some days hence, of presentment to Dresdner Bank, and was thus in no position to quote a precise rate to Gossels. We think this argument without merit; the internal rate sheet published for bank use only established the rate at approximately four percent less than current spot rates, and Fleet was in a position to advise Gossels of this and all other material facts, and to attempt to secure his agreement to a reduced amount.

*Conclusion.* The judge's finding under count I of the complaint that Fleet is liable to Gossels for negligent misrepresentation has not been shown to be erroneous. On the undisputed facts, Gossels is entitled to judgment as well on counts II (conversion) and III (G. L. c. 93A) of his complaint.[22] Duplicative

[21]The trial judge found, and we agree, that insofar as the presentment to Dresdner Bank is concerned, Fleet appropriately followed the provisions of § 3-107. There is no claim that Fleet failed to obtain the appropriate amount of money at this point.

[22]As to count IV, we conclude that there was no violation of G. L. c. 106, § 3-107. The option whether to make payment in the foreign currency or in dollars lies in the payor bank, a choice over which the collecting bank has no control.

damages under the multiple counts is not allowed, however. See *Calimlim* v. *Foreign Car Center, Inc.*, 392 Mass. 228, 235 (1984); *Mailman's Steam Carpet Cleaning Corp.* v. *Lizotte*, 415 Mass. 865, 870 (1993). The judgment is vacated and we remand the case to the trial court for entry of a single judgment in favor of Gossels on the aforementioned claims, reflecting actual damages in the amount of $10,269.03.[23]

As she denied Gossels's claim under G. L. c. 93A, the trial judge never reached the issue whether Fleet had responded to Gossels's c. 93A demand letter. Nothing in the record suggests that it did so. As we have concluded that Gossels was entitled to judgment on his claim pursuant to G. L. c. 93A, the trial court shall also, consistent with this opinion, determine whether Fleet's violation was such as to make appropriate an award of multiple damages in accordance with c. 93A, § 9(3). See *Grand Pac. Fin. Corp.* v. *Brauer*, 57 Mass. App. Ct. at 422. Gossels shall also be entitled to reasonable attorney's fees and costs in the trial court. See G. L. c. 93A, § 9(4). The trial judge may take further evidence on each of these items on remand.

*So ordered.*

·

---

[23] As we conclude that count I of Gossels's complaint sounds in tort and not in contract, there was no error, as claimed by Gossels, in the failure to award prejudgment interest from the date Fleet paid the check. Prejudgment interest shall be awarded from October 4, 2001, the date of commencement of this action, pursuant to G. L. c. 231, § 6B.