C. Peter R. Gossels *vs.* Fleet National Bank.

Suffolk. November 3, 2008. - March 12, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, & Botsford, JJ.

*Contract,* Performance and breach. *Uniform Commercial Code,* Payment on negotiable instrument. *Bank. Conversion. Negligence,* Misrepresentation. *Consumer Protection Act,* Bank. *Damages,* Negligent misrepresentation.

Discussion of the principles underlying G. L. c. 106, § 1-102 (2), the statutory framework designed to implement the Uniform Commercial Code's national, uniform system of check collection. [370-371]

In a civil action alleging claims against a bank arising from its handling of a check presented to it for collection by the plaintiff, the bank waived any claim of error regarding the judgment against it on the plaintiff's negligent misrepresentation claim when the bank had an opportunity to contest the judgment before the Appellate Division but chose not to do so [371]; however, the record at any rate did not establish the elements of a claim for negligent misrepresentation [371-372] or demonstrate that the bank, which met its duty of ordinary care at every stage of the transaction, failed to make any disclosures required by the common law or by statute, so as to give rise to liability under G. L. c. 93A, §§ 2 and 9 [373-375]; further, the plaintiff could not maintain claims for conversion of funds under G. L. c. 106, § 3-420 [372-373], or for violation of the exchange rate requirement of G. L. c. 106, § 3-107 [376].

Civil action commenced in the Central Division of the Boston Municipal Court Department on October 4, 2001.

The case was heard by *Sally A. Kelly,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*S. Elaine McChesney* (*Jason L. Watkins* with her) for the defendant.

*C. Peter R. Gossels,* pro se.

*Brenda R. Sharton, Dahlia S. Fetouh, & Dennis N. D'Angelo,* for Massachusetts Bankers Association, Inc., amicus curiae, submitted a brief.

Cordy, J. This is a check collection case in which we must decide whether Fleet National Bank (Fleet) is liable for the

handling of a check presented to it for collection by C. Peter R. Gossels under theories of negligent misrepresentation (Count I)[1]; conversion (Count II); violation of the consumer protection laws, G. L. c. 93A, §§ 2 and 9 (Count III); and violation of the exchange rate requirement of the Uniform Commercial Code (UCC), G. L. c. 106, § 3-107 (Count IV).[2] After a bench trial in the Boston Municipal Court, the trial judge entered judgment for Fleet on Counts II-IV, but found it liable for negligent misrepresentation and awarded Gossels $6,861.68 in damages and $2,021.29 in interest. On Gossels's appeal, the Appellate Division affirmed. On Gossels's further appeal, the Appeals Court affirmed the judgment on the negligent misrepresentation count (increasing the damages to $10,269.03 plus interest), and reversed the judgments for Fleet on Counts II (conversion) and III (G. L. c. 93A), entering judgments for Gossels on those claims.[3] *Gossels* v. *Fleet Nat'l Bank,* 69 Mass. App. Ct. 797, 812b-812c (2007). We granted Fleet's application for further appellate review. We affirm the judgments for Fleet on Counts II, III, and IV. We affirm the judgment for Gossels on the negligent misrepresentation claim (in the amount awarded by the judge) only because Fleet waived any claim of error when it failed to appeal from that judgment to the Appellate Division.[4]

1. *Background.* The trial judge made the following findings of fact. As a reparations payment for a theft committed by the Nazis against Gossels's family, the German government sent Gossels a check for 85,071.19 euros, drawn on Dresdner Bank in Germany.[5] On October 15, 1999, Gossels went to a Fleet

[1]Count I of Gossels's initial complaint alleged breach of contract. The trial judge found Fleet National Bank (Fleet) liable under Count I, but only insofar as it alleged negligent misrepresentation.

[2]Gossels amended his original complaint to add Count IV, which alleged only that "Fleet owes Gossels the sum of 84,971.19 Euros that it received from the Deutsche Bank in November or December 1999 on account of a check of the Dresdner Bank that Gossels had given Fleet to collect." The Appeals Court concluded that Count IV alleged a violation of G. L. c. 106, § 3-107. *Gossels* v. *Fleet Nat'l Bank,* 69 Mass. App. Ct. 797, 798 (2007).

[3]As explained in its decision, *id.* at 797 n.1, the Appeals Court issued an initial opinion in the case, that, on reconsideration, was substantially revised.

[4]We acknowledge the amicus brief in support of the defendants submitted on behalf of the Massachusetts Bankers Association, Inc.

[5]Dresdner Bank was the payor bank. See G. L. c. 106, § 4-105 (payor bank

branch in Boston to present the check for collection.[6] The teller he spoke to at the bank did not tell Gossels that the proceeds of the check would be converted from euros to dollars for deposit in his Fleet account, and the judge credited Gossels's testimony that he would have gone to another bank had he known that Fleet would convert the euros to dollars.[7] The teller accepted the check and told Gossels that he was not required to indorse the check because it was drawn on a foreign bank. She then handed Gossels a preprinted receipt that showed two possible payment options: "provisional credit" or "collection only." Neither box was checked.

Fleet kept a foreign check collection procedures manual, which instructed tellers to tell customers the length of the collection process (four to six weeks), the relevant date for determining the exchange rate, and how the rate would be determined. The Fleet teller did not provide Gossels with any of this information.

On November 11, 1999, Fleet contacted Gossels and told him that there had been a problem with the check collection process. He returned to the bank and met with a manager who asked Gossels to indorse the check, which was then sent a second time for collection.[8]

In resolving the case on appeal, the Appeals Court made note of additional facts that it concluded were supported by the record but not specifically referenced or found by the judge.[9] In particular, the Appeals Court noted that the printed receipt stated

is "drawee of a draft"); G. L. c. 106, § 3-103 (drawee is "person ordered in a draft to make payment").

[6]In this case, Fleet acted as a "[c]ollecting bank." G. L. c. 106, § 4-105 (collecting bank is "bank handling an item for collection except the payor bank").

[7]The judge also found that Gossels asked the teller to collect the total amount of the check in euros. There is no evidence to support this finding. The parties do not dispute (and the Appeals Court held) that the finding is clearly erroneous. Gossels testified only that although he did not "ask Fleet to exchange [the] bank check into dollars," he "expected [the bank] to collect the Euros."

[8]Fleet initially charged Gossels a processing fee of thirty dollars, claiming the delay resulted from Gossels's failure to indorse the check. When Gossels objected, the manager waived the fee and credited him with $38.25 in "lost interest" due to the delay in collecting the amount of the check.

[9]When a trial judge does not make a specific finding, an appellate court may consider stipulated facts, documentary facts, and facts that are not contested

that Fleet was "acting as an agent for collection on [Gossels's] behalf." *Gossels* v. *Fleet Nat'l Bank, supra* at 800. It also noted that Fleet sent the check to Deutsche Bank in Germany, which acted as Fleet's corresponding bank for the collection of checks drawn on German banks, and that Deutsche Bank had returned the check to Fleet purportedly because it lacked an indorsement and Deutsche Bank had not received a guaranty by Fleet in lieu of Gossels's indorsement.[10] *Id.* at 800 & n.8.

After Gossels indorsed the check, Fleet sent the check back to Deutsche Bank for collection; the Dresdner Bank then transferred 85,071.19 euros to Deutsche Bank. After deducting a transaction fee of one hundred euros, Deutsche Bank credited Fleet's account with 84,971.19 euros. Fleet exchanged the euros for dollars at its retail exchange rate and deposited $81,754.77 into Gossels's Fleet account on December 15, 1999. *Id.* at 801. The "retail" exchange rate Fleet offered customers for euros was lower (in dollars) than the "spot" or interbank exchange rate that it was entitled to receive from other banks. *Id.* See G. L. c. 106, § 3-107.[11]

The judge found that the value of the euro declined in the interim between October 15, 1999, when the check was presented to Fleet, and December 15, 1999, when Fleet received the euros from the Dresdner Bank (through Deutsche Bank). The judge also found that this decline in value amounted to $6,861.68, and

and clearly established on the record. *Bruno* v. *Bruno,* 384 Mass. 31, 35 (1981). It may also make additional findings that are not in conflict with the judge's permissible findings. *Id.* The appellate court must defer to the judge on issues of witness credibility. *General Dynamics Corp.* v. *Assessors of Quincy,* 388 Mass. 24, 29 (1983).

[10]Neither the judge nor the Appeals Court made specific findings regarding the guaranty from Fleet that was sought by Deutsche Bank. The record reflects that on November 1, 1999, Deutsche Bank sent an electronic message asking Fleet to indemnify Deutsche Bank against any liability resulting from the check because it lacked Gossels's indorsement. The message said that if Deutsche did not receive Fleet's confirmation "within 3 days, [Deutsche] shall return the cheque to you." On November 3, 1999, Fleet electronically sent the requested indemnification to Fleet. Nonetheless, Deutsche Bank returned the check.

[11]General Laws c. 106, § 3-107, states: "Unless the instrument otherwise provides, an instrument that states the amount payable in foreign money may be paid in the foreign money or in an equivalent amount in dollars calculated by using the current bank-offered spot rate at the place of payment for the purchase of dollars on the day on which the instrument is paid."

awarded that amount (plus interest) to Gossels as damages for the bank's "negligence" in failing to disclose all the terms of the transaction and in failing to require that Gossels indorse the check.[12]

The Appeals Court increased the award of damages on the negligent misrepresentation claim by adding another factor into its calculation: the differential between Fleet's retail and spot exchange rates. It found that on October 15, 1999, Gossels's check would have been worth $88,616.45 based on the Fleet retail exchange rate and $92,023.80 based on the spot rate. *Gossels* v. *Fleet Nat'l Bank, supra* at 801. This rate differential, the Appeals Court held, was detailed on a rate sheet that Fleet did not distribute to the public. *Id.* at 808. Consequently, it awarded Gossels $10,269.03, the difference between what he had received in dollars from Fleet on December 15 ($81,754.77) and what he would have received on October 15 at the spot rate ($92,023.80). *Id.* at 801, 812b.

2. *Discussion.* Check collection is governed by the UCC, a statutory framework designed to implement, among other things, a national, uniform system of check collection. G. L. c. 106, § 1-102 (2) ("Underlying purposes and policies of this chapter are . . . to make uniform the law among the various jurisdictions"). Where a UCC provision specifically defines parties' rights and remedies, it displaces analogous common-law theories of liability. *National Shawmut Bank* v. *Vera*, 352 Mass. 11, 16 (1967), citing *Stone & Webster Eng'g Corp.* v. *First Nat'l Bank & Trust Co.*, 345 Mass. 1, 5 (1962). Otherwise, banks would face a motley patchwork of liability standards from State to State.

There are several bedrock principles with respect to that framework (and much of the common law that preceded it), two of which bear repeating here. First, the bank customer remains the owner of the check throughout the collection process and bears the risk of collection, including the risk in foreign currency fluctu-

---

[12]The judge reasoned that Gossels would have received the full value of the euros (in dollars) on October 15, 1999, if Fleet had granted him "provisional credit" on that date. She did not, however, take into account that whatever "provisional" credit Gossels may have received (had he asked for it on October 15, 1999) would have been adjusted (downward in this case) to the value of the euros on the date Fleet received payment on the check from the Dresdner Bank. See part 2.c, *infra.*

ation. See *Fabens* v. *Mercantile Bank*, 23 Pick. 330, 332-333 (1839); G. L. c. 106, § 4-201 (*a*). Second, the collecting bank is held only to a standard of ordinary care in making the collection. *Fabens* v. *Mercantile Bank*, *supra* at 331-332; G. L. c. 106, § 4-202 (*a*). So long as it has fulfilled this obligation, the collecting bank is not liable for the conduct of other banks in the chain of collection. G. L. c. 106, § 4-202 (*c*).

a. *Negligent misrepresentation.* Fleet argues here that the trial judge erred in holding that the bank was liable for making negligent misrepresentations to Gossels. It claims that Fleet did not tell Gossels that the check would be paid in euros, that Gossels presented no evidence of detrimental reliance (as required to make out his claim), and that Gossels was bound by Fleet's customary check practices. All of these arguments were waived.

In a civil case, after a judgment by the District Court, an "appellant is barred from pursuing in the Appeals Court a claim of error that it failed to raise at the Appellate Division." M.G. Perlin & J.M. Connors, Civil Procedure in the Massachusetts District Court § 12.26, at 160 (3d ed. Supp. 2007), citing *Brossi* v. *Fisher*, 51 Mass. App. Ct. 543, 550 (2001). When an appellant's claim of error is "not presented to or decided by the Appellate Division[,] [i]t cannot be considered by us." *Kelsey* v. *Hampton Court Hotel Co.*, 327 Mass. 150, 152 (1951), citing *Reliable Fin. Corp.* v. *Baldrate*, 291 Mass. 150 (1935). In this case, Fleet chose not to appeal from the judge's judgment of $6,861.68 (plus interest) for negligent misrepresentation. Fleet conceded this point before the Appeals Court, admitting that it "did not appeal [from] the [judge's] judgment for actual damages, seeking to pay the judgment amount." The bank had an opportunity to contest the judgment on Count I before the Appellate Division, but chose not to do so; therefore, Fleet's cross appeal on that issue was not properly before the Appeals Court, and we do not consider it. *Kelsey* v. *Hampton Court Hotel Co.*, *supra.*

However, because there are rulings from two courts in this case that sustain Gossels's negligent misrepresentation claim and impose disclosure obligations on Fleet that we conclude are not required by the UCC, we will proceed to analyze the claim for the purpose of guidance and clarity. In order to recover for negligent misrepresentation a plaintiff must prove that the defendant

(1) in the course of his business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance on the information, and that he (6) failed to exercise reasonable care or competence in obtaining or communicating the information. See *Nycal Corp.* v. *KPMG Peat Marwick LLP*, 426 Mass. 491, 495-496 (1998), quoting Restatement (Second) of Torts § 552 (1977). See also *Golber* v. *Bay-Bank Valley Trust Co.*, 46 Mass. App. Ct. 256, 257 (1999).

As later described, see part 2.c, *infra*, Fleet was correct when it told Gossels that his indorsement was not required. G. L. c. 106, § 4-205 (1). Therefore, that instruction was not "false" in any way, and could not give rise to any liability. Nor was Fleet required to inform Gossels that his account would be credited in dollars, that he would not receive provisional credit, or that banks were entitled to different exchange rates than customers. These three issues are "bare nondisclosure[s]," which do not trigger liability. *Swinton* v. *Whitinsville Sav. Bank*, 311 Mass. 677, 679 (1942). Even assuming that Fleet did tell "half-truths," *Golber* v. *Bay-Bank Valley Trust Co.*, *supra* at 258, Gossels's claim would still fail, because there is no evidence of any detrimental reliance on his part. The record is devoid of evidence that a different bank would have collected payment in euros, or would have provided provisional credit, or would have applied the interbank rate of exchange. For all of these reasons, the negligent misrepresentation claim should have failed.

b. *Conversion.* Banks are not liable for conversion when they fail to pay funds that they owe to a customer. *Freeman's Nat'l Bank* v. *National Tube Works, Inc.*, 151 Mass. 413, 418 (1890). Once payment on a check has been delivered to a collecting bank, the collecting bank and its customer have only a debtor-creditor relationship. *Id.* at 418-419. The customer does not have a right to the "specific fund[s]" transferred to the collecting bank. *Id.* at 418. Conversion occurs only when a defendant exercises wrongful control over specific personal property, not a debt; therefore, bank accounts cannot be the subject of conversion. See *Reliance Ins. Co.* v. *U.S. Bank*, 143 F.3d 502, 506 (9th Cir. 1998).

Additionally, the UCC does not provide any rights or remedies relating to the conversion of *funds*; rather, the sole conversion

provision relates specifically to the conversion of *instruments*.[13] G. L. c. 106, § 3-420. Here, Gossels alleges only that Fleet converted his funds; he does not claim that the bank improperly refused to deliver his check, or that the bank took the check "from a person not entitled to enforce the instrument." G. L. c. 106, § 3-420 (*a*). Consistent with the common law, the statutory law does not provide Gossels with a claim for conversion.

c. *General Laws c. 93A.* Section 2 of G. L. c. 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." An action is "unfair" if it is "(1) within the penumbra of a common law, statutory, or other established concept of unfairness; [or] (2) immoral, unethical, oppressive, or unscrupulous." *Milliken & Co.* v. *Duro Textiles, LLC*, 451 Mass. 547, 563 (2008), quoting *Morrison* v. *Toys "R" Us, Inc.*, 441 Mass. 451, 457 (2004). The Appeals Court concluded that Fleet violated G. L. c. 93A because it told Gossels not to indorse his check; failed to disclose that Gossels's account would be credited in dollars and not in euros; failed to tell Gossels whether the transaction was for provisional credit or for collection only; failed to disclose amounts Fleet would deduct for itself, "in particular the rate differential the bank would pay based on its internal [currency exchange] rate sheet"; continuously told Gossels that he had been treated fairly while failing to reveal the details of the internal rate sheet; and failed to follow its own instruction manual for the collection of foreign checks. *Gossels* v. *Fleet Nat'l Bank*, 69 Mass. App. Ct. 797, 811-812 (2007). Neither the common law nor the UCC requires any of these disclosures, and Fleet met its duty of "ordinary care" at every stage of the transaction. G. L. c. 106, § 4-202. Therefore, there was no violation of G. L. c. 93A.

First, Fleet was correct to tell Gossels that he was not required to indorse his check. The depositary bank (in this case, Fleet) becomes the holder of a check and is entitled to collect payment "whether or not the customer indorses the item." G. L. c. 106, § 4-205 (1). If there was error in the rejection of the check for lack of indorsement, the error was that of Deutsche Bank, for which Fleet is not liable. G. L. c. 106, § 4-202 (*c*) (no bank

---

[13]An "[i]nstrument" is defined as "a negotiable instrument," G. L. c. 106, § 3-104 (*b*), which is further defined as "an unconditional promise or order to pay a fixed amount of money." G. L. c. 106, § 3-104 (*a*).

liable "for the insolvency, neglect, misconduct, mistake, or default of another bank").

Second, Fleet was not required to tell Gossels that his account would be credited in dollars instead of euros. In the United States, the presumption is that checks will be paid in dollars. 6 W.D. Hawkland & L. Lawrence, Uniform Commercial Code Series § 3-107:1 (rev. art. 3) (1999) ("Where the maker wishes to specify a foreign currency as the sole medium of payment, that specification must be express"). The receipt that Fleet gave Gossels on October 15 stated that if Gossels received provisional credit, a foreign exchange rate ("FX Rate") would apply, and if the check was taken for collection only, "Rate and fees [would be] determined at [the] time of settlement." The receipt put Gossels on notice that Fleet would apply an exchange rate to the euros sent from Dresdner; absent a contrary agreement, United States currency is legal tender for all debts. 31 U.S.C. § 5103 (2006).

Third, Fleet was not required to inform Gossels whether he would receive provisional credit or whether the transaction was for collection only. The UCC does not impose such a requirement; it merely states that "before the time that a settlement given by a collecting bank for an item is or becomes final . . . any settlement given for the item is provisional." G. L. c. 106, § 4-201. Nor does the common law require such disclosure where, like here, there is no effective difference between granting provisional credit and accepting a check for collection only. A provisional credit is not an advance payment of the presented check; rather, it is similar to a loan. *Washington Legal Found.* v. *Texas Equal Access to Justice Found.*, 94 F.3d 996, 1004 (5th Cir. 1996) (provisional credit is effectively loan); *In re Frigitemp Corp.*, 34 B.R. 1000, 1015 (S.D.N.Y. 1983) (beyond rights of loan, provisional credit "gives the bank the rights of a holder in due course of the negotiable instrument"). After a bank has given a provisional credit, it has the right to charge back any value that is not paid in settlement. G. L. c. 106, § 4-214. As a result, whether a bank offers "provisional credit" or "collection only," the final settlement amount that a customer receives is the same. While generally, G. L. c. 93A imposes a duty to disclose "material facts known to a party at the time of a transaction," *Underwood* v. *Risman*, 414 Mass. 96, 99-100 (1993), citing *Nei*

v. *Burley*, 388 Mass. 307, 316-317 (1983), the provisional credit-collection distinction is not material, because either option would result in the same final payment to the customer at the time of settlement.

Fourth, the analysis of the rate differential issue is incorrect. Although the Appeals Court found that the retail "rate sheet was to be kept secret from customers," *Gossels* v. *Fleet Nat'l Bank*, *supra* at 808, this was clearly not the case. At trial, there was undisputed testimony that Fleet customers could call a dedicated telephone number to learn the daily retail currency exchange rates.[14] Further, Fleet never engaged in arbitrage with Gossels's funds in the manner suggested by the Appeals Court. *Id.* at 807, 808 (claiming that Fleet paid Gossels "at a retail exchange rate that was several percentage points lower than the *spot rate it received* for foreign currency"; Fleet paid "Gossels a retail rate of exchange substantially less than the *spot rate it obtained* for the item" [emphasis added]). Fleet never received money that had been exchanged using any spot rate at all; rather, as Gossels concedes, Deutsche Bank "credited 84,971.19 euros to Fleet's account." *Id.* at 801. Only one currency exchange (from euros to dollars) occurred, and Fleet did nothing improper when it exchanged the euros it received from Deutsche Bank using its normal customer retail exchange rate. *Id.* at 807-808 n.16.

Fifth, neither the UCC nor the common law imposes liability for the teller's failure to make the disclosures detailed in the bank's foreign check collection procedures manual. As described *supra*, the UCC requires only that collecting banks use ordinary care as they seek to collect settlements on instruments. G. L. c. 106, § 4-202. Elevating a bank's internal manuals to a set of affirmative disclosure requirements on par with the requirements of the UCC would vitiate the goal of "mak[ing] uniform the law among the various jurisdictions." G. L. c. 106, § 1-102.

Insofar as Fleet did not violate any of its duties of care or commit an "immoral, unethical, oppressive, or unscrupulous" business practice as required by G. L. c. 93A, *Milliken & Co.* v. *Duro Textiles, LLC*, 451 Mass. 547, 563 (2008), judgment in favor of Fleet on Count III was properly entered in the trial court.

---

[14]There was testimony that the physical piece of paper was not distributed because rates fluctuated daily, and it could have caused confusion. However, the trial judge made no findings of fact regarding that testimony.

d. *G. L. c. 106, § 3-107, and damages calculation.* Count IV
of Gossels's amended complaint alleged a violation of G. L.
c. 106, § 3-107. When an instrument is payable in foreign money,
§ 3-107 requires that the instrument be paid "in the foreign
money or in an equivalent amount in dollars calculated by using
the current bank-offered spot rate at the place of payment." How-
ever, § 3-107 applies to the payor bank (Dresdner) only, and not
the collecting bank (Fleet). The choice whether to make payment
in the foreign currency or in dollars lies with the payor bank, a
choice over which the collecting bank has no control. Here,
Dresdner elected to pay Fleet in euros, and, as we have noted,
Fleet was under no obligation pursuant to the UCC to pay Gos-
sels the spot rate of exchange in dollars for those euros. Judg-
ment was properly entered for Fleet on this claim.[15]

3. *Conclusion.* Insofar as Fleet failed to raise its claim of error
on the negligent misrepresentation claim before the Appellate
Division, and therefore waived its arguments, we affirm the judg-
ment as to Count I.[16] We also affirm the judgments for Fleet on
Counts II-IV.

*So ordered.*

---

[15]Despite finding in favor of Fleet on Count IV, the Appeals Court calculated
damages using the spot rate. The court reasoned that the spot rate was the rate
Fleet owed Gossels "[a]bsent an agreement to the contrary . . . ." *Gossels* v.
*Fleet Nat'l Bank, supra* at 812a. It therefore increased Gossels's award to
$10,269.03. This was error. As § 3-107 clearly states, only the payor bank has
a duty to exchange foreign currency to dollars using a spot rate of exchange.
"Fleet appropriately followed the provisions of § 3-107." *Gossels* v. *Fleet
Nat'l Bank, supra* at 812 n.21.

[16]The judge's damages award reflects the currency fluctuation that occurred
as Gossels waited for his account to be credited. Article 4 of the UCC, and the
"Massachusetts rule" that preceded it, place the risk of loss not on the collect-
ing bank, but on the owner of the item. *Fabens* v. *Mercantile Bank,* 23 Pick.
330, 332-333 (1839); G. L. c. 106, § 4-201 (*a*). However, as noted, Fleet did
not appeal from the judgment to the Appellate Division, and therefore waived
any claim of error.