# United States Court of Appeals
## For the First Circuit

Nos. 08-1690; 08-1691

JOSEPH BRAUNSTEIN, Chapter 7 Trustee of
TMG Holdings, LLC and of Edwin A. McCabe,

Plaintiff, Appellee/Cross-Appellant,

v.

EDWIN A. MCCABE; KARREN K. MCCABE,

Defendants, Appellants/Cross-Appellees,

v.

CRAIG J. ZIADY,

Fourth-Party Defendant, Appellee,

DANN OCEAN TOWING, INC.,

Defendant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

Joseph H. Reinhardt for appellants/cross-appellees.
Mark W. Corner with whom Riemer & Braunstein LLP was on brief
for appellee/cross-appellant Joseph Braunstein and appellee Craig
J. Ziady.

June 26, 2009

**LYNCH**, <u>**Chief Judge**</u>. This appeal requires us to address several issues of first impression in bankruptcy law in this circuit. The first is whether there is a jury trial right under the Seventh Amendment in actions by trustees to compel the turnover of property to the estate under 11 U.S.C. § 542. The second concerns what is meant by the "ordinary course of business" of a debtor for purposes of 11 U.S.C. § 363, which allows trustees to make ordinary expenditures necessary for the operation of a business without involvement of the bankruptcy court. The third concerns whether a cause of action for negligent misrepresentation is stated by the debtors against the trustee's counsel.

The appeal arises from two actions brought by the trustee, Joseph Braunstein, concerning the assets of the estate in bankruptcy of a former lawyer, Edwin McCabe (whom we shall call "McCabe"), his wife Karren, and various entities they controlled. The trustee filed a turnover complaint to obtain $77,572.69 in insurance proceeds which had been paid to McCabe in settlement of claims arising from wake damage a maritime towing company caused to the luxury houseboat on which the McCabes lived, and which was owned by the estate.

The McCabes appeal from both the district court's denial of their jury trial demand and from the $30,262.69 amount the court ordered turned over, on the ground the court used the wrong legal standard and used incorrect information about the balance in their

bank account.  The trustee cross-appeals and argues the court used the wrong legal standard for "ordinary course of business" and that the turnover amount is too small.

A separate issue is raised by the McCabes' appeal from the district court's dismissal of their attempt to sue an attorney representing the trustee, for negligent misrepresentation, in an admiralty action the trustee brought against the towing company. That admiralty action is not otherwise relevant to this appeal; a jury heard the case and found in favor of the towing company.

The turnover action arose after McCabe, operating the estate as debtor-in-possession, expended estate funds in a way that actually decreased the value of the estate's primary asset, the houseboat.  Contrary to the district court, we hold that McCabe did not make these expenditures within the ordinary course of business. We reverse and remand on that issue.  We affirm the court's denial of a jury trial on the turnover claim and its dismissal of the claim against the attorney working with the trustee.

I.

The McCabes lived on the houseboat, the Esperaunce, which was berthed in Charlestown, Massachusetts.  It was owned by a limited liability company named TMG Holdings, LLC, ("Holdings"). The Esperaunce was Holdings' sole asset.  Holdings was managed and 99% of its shares were owned by The McCabe Group, a professional corporation through which McCabe and others provided legal

services. McCabe was the sole shareholder in The McCabe Group and held a 1% share in Holdings. Holdings chartered the Esperaunce to The McCabe Group, which in turn subchartered the boat to the McCabes. The McCabe Group and McCabe each filed for bankruptcy on September 3, 2003, and Holdings filed on February 20, 2004. McCabe functioned as debtor-in-possession in all three cases, which were Chapter 11 filings.

After the initial filings, on December 18, 2003, the Esperaunce was damaged by the wake of a tugboat owned by Dann Ocean Towing. The McCabes filed a claim with Dann's insurance company, which was settled for $95,230.95 on December 8, 2004. Under the settlement agreement, $17,658.26 was earmarked for alternate living arrangements for the McCabes while $77,572.69 was for damage to the Esperaunce. The trustee does not dispute that the $17,658.26 belonged to the McCabes. While McCabe was the debtor-in-possession, he did not open a separate account in that capacity. Rather, he commingled the insurance funds with the funds in his and his wife's personal account. The McCabes deposited all of the insurance proceeds into that account, which was held in Karren's name.

Without notifying the bankruptcy court or seeking its approval, the McCabes arranged to have work done on the Esperaunce from the insurance proceeds. They spent $47,310 to have the boat towed to a marina in Gloucester, Massachusetts on October 30, 2004

-4-

and to have initial repair work conducted. That work consisted of dismantling or demolishing portions of the boat. The record shows that this work was done to repair the wake damage, to enable refurbishment of the houseboat's structure in order to address water damage that predated the wake incident, and to make structural improvements to the boat. Despite the wake damage, the McCabes had continued to live on the houseboat while they settled their claim with the insurer. The work actually done and paid for decreased the value of the boat.

On February 16, 2005, the petitions for Holdings and McCabe were converted to Chapter 7 liquidations and Braunstein was appointed trustee (he had been appointed interim trustee in The McCabe Group's case on November 5, 2004). McCabe ordered a halt to the repair work on February 16 and Braunstein took possession of the Esperaunce.

Braunstein received an offer to purchase the Esperaunce. On October 26, 2005, before the sale was finalized, attorney Craig J. Ziady, the trustee's counsel, emailed McCabe. He told McCabe about the offer and wrote that if Braunstein "decides to move forward, there will be a sale motion, with the customary counter-offer procedures, etc., of which you will certainly be provided notice." In November 2005, Braunstein conducted, with bankruptcy court approval, a sale of the boat for $42,000. The McCabes were not given notice as attorney Ziady had represented. They concede

-5-

they were not actually entitled to notice because they did not file an appearance and request for notice.  See Fed. R. Bankr. P. 9010.

Braunstein filed a complaint against the McCabes in bankruptcy court on February 28, 2005 requesting, under 11 U.S.C. § 542, a turnover and accounting of estate property in the McCabes' possession, "including but not limited to certain insurance settlement proceeds obtained by McCabe and Karren McCabe post-petition and without bankruptcy court approval," as well as a restraining order to prevent the McCabes from spending any more estate funds.  No claim was made of fraudulent transfer.  The McCabes asserted counterclaims alleging Braunstein initiated the adversary proceeding in bad faith and was in breach of his fiduciary duty as trustee.  They also answered the turnover claim and demanded a jury trial on it.

On May 23, 2006, Braunstein sued Dann, the owner of the boat that caused the wake damage, for negligence in federal district court in Massachusetts under the court's admiralty jurisdiction. Dann brought a third-party claim for indemnification against the McCabes.  The McCabes counterclaimed against Braunstein, alleging conversion and breach of fiduciary duty, and filed a fourth-party complaint against attorney Ziady for negligent misrepresentation based on his failure to give them notice of the sale of the Esperaunce.  On motion of the parties, the district

court consolidated the negligence claim in admiralty and the turnover claims in bankruptcy on December 12, 2006.

Attorney Ziady moved to dismiss the fourth-party complaint against him on December 28, 2006. At the motion hearing, the court stated it would dismiss because attorney Ziady owed no legal duty to the McCabes, and on February 13, 2007, it entered an electronic order granting the motion.[1] The McCabes moved for reconsideration, arguing that the existence of a legal duty is not an element of a negligent misrepresentation claim. They also sought leave to amend their fourth-party complaint to assert a claim against attorney Ziady for promissory estoppel.[2] The court denied the motion on February 28, 2007.

On January 3, 2008, the court entered an order denying the McCabes' jury trial demand in the turnover case. The negligence case was tried first under the court's admiralty jurisdiction. On January 10, the jury entered a verdict in favor of Dann on Braunstein's negligence complaint against the company.

_____

[1] The McCabes sued attorney Ziady in state court on September 9, 2007 for breach of contract. That court granted summary judgment to attorney Ziady on res judicata grounds. McCabe v. Ziady, No. ESCV2007-1679, 2009 WL 839102, at *3-5 (Mass. Super. Ct. Mar. 16, 2009).

[2] The McCabes characterized the claim as one for "detrimental reliance." Promissory estoppel is the more common name for the cause of action, but Massachusetts courts use both names. See R.I. Hosp. Trust Nat'l Bank v. Varadian, 647 N.E.2d 1174, 1178-79 (Mass. 1995); Loranger Constr. Corp. v. E.F. Hauserman Co., 384 N.E.2d 176, 179 (Mass. 1978).

It concluded that McCabe had acted as Holdings' authorized agent in settling with Dann and that the Holdings estate therefore did not have a claim against Dann that Braunstein could assert.

The court held a bench trial on the turnover claim immediately after the conclusion of the negligence case. At the trial, McCabe testified that Holdings, the owner of the boat, "was not in business" and that "there were no operations of Holdings." The repairs were meant to "enhance" the value of the houseboat, and there was a significant amount of work to be done not covered by the insurance.

The reason for the repair of the houseboat, McCabe testified, was that he and his wife loved it. He testified that he considered that it was in the best interest of the creditors for him to use the houseboat "as [his] principal residence," and to "pay[] all the attendant costs." He did not intend to pay the creditors from the operations of Holdings, since there were no operations, but he hoped to pay the creditors personally.

The houseboat had been purchased primarily from funds from The McCabe Group, which McCabe provided to The McCabe Group. As a result, he paid no rent to Holdings, but rather took an offset of $1600 a month against his contributions to the purchase price.

The court found the McCabes had incurred the repair expenditures in good faith and that they "were reasonable, necessary, and proper expenses." It found the expenditures were

made in the ordinary course of business and that McCabe thus had the authority, as debtor-in-possession, to enter into the expenditures without notice to the court and creditors and a hearing. The court ordered the McCabes to turn over the remaining portion of the settlement funds -- $30,262.69 -- and, on the basis that the McCabes had commingled the remaining estate funds with their personal funds, considered whether to reduce the amount to be turned over to the lowest intermediate balance of the combined account. See Conn. Gen. Life Ins. Co. v. Universal Ins. Co., 838 F.2d 612, 619 (1st Cir. 1988). It ordered turnover of the full $30,262.69 because it found the balance of the McCabes' account never dropped below that level.

The McCabes appeal the denial of their jury trial demand, the court's application of the lowest intermediate balance test to the turnover amount, the dismissal of their claim against attorney Ziady, and the refusal to allow them to amend their complaint to add new claims against him. Braunstein cross-appeals the court's order reducing the turnover amount by the amount the McCabes spent repairing the Esperaunce.

II.

A.      Whether There is a Seventh Amendment Right to a Jury
        Trial in 11 U.S.C. § 542 Turnover Actions by Trustees

The McCabes challenge the district court's denial of their jury trial demand in the turnover action. The jury trial issue presents a legal question, which we review de novo. As best

-9-

we can tell there is no circuit court of appeals case on this point. The majority of the precedent, from the district and bankruptcy courts, holds there is no jury trial right on a trustee's turnover claim.[3] We hold that no right to trial by jury attaches to the statutory turnover action authorized by § 542.

Section 542 is captioned: "Turnover of property to the estate." The trustee's suit was brought under subsection (a), which provides: "an entity, other than a custodian, in possession, custody, or control during the case of property" of the estate "shall deliver to the trustee, and account for, such property or the value of such property."[4] 11 U.S.C. § 542(a). The "property" referred to is "property that the trustee may use, sell, or lease under section 363" or that the debtor "may exempt under section

---

[3] Compare Salven v. Lyons, No. CIV-F-06-1114, 2007 WL 470625, at *3-4 (E.D. Cal. Feb. 9, 2007), Walker v. Weese, 286 B.R. 294, 299 (D. Md. 2002), Keller v. Blinder (In re Blinder, Robinson & Co.), 146 B.R. 28, 30-31 (D. Colo. 1992), Notinger v. Brown (In re Simply Media, Inc.), No. 07-1030, 2007 WL 4264514, at *6 (Bankr. D.N.H. Nov. 28, 2007), Gecker v. Gierczyk (In re Glenn), 359 B.R. 200 (Bankr. N.D. Ill. 2006), Welt v. Leshin (In re Warmus), 252 B.R. 584, 586-87 (Bankr. S.D. Fla. 2000), Allard v. Akhoff (In re Ackhoff), 252 B.R. 396, 397-98 (Bankr. E.D. Mich. 2000), and Anderson v. Simchon (In re S. Textile Knitters, Inc.), 236 B.R. 207, 213 (Bankr. D.S.C. 1999), with Stewart-Hall Mktg., Inc. v. Bob Maddox Dodge, Inc. (In re Stewart-Hall Mktg., Inc.), Nos. 89-10275 et al., 1990 WL 10007428, at *2 (Bankr. S.D. Ga. 1990).

[4] In addition, under subsection (b), "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee." 11 U.S.C. § 542(b).

522."[5]  Id.  This requires everyone holding property of the estate on the date of filing from which the trustee may benefit the estate under § 363 to deliver the property to the trustee.  This is subject to an offset, and there are exceptions not involved here.[6]

Section 542 was added to the Bankruptcy Code as part of the Bankruptcy Reform Act of 1978.  Congress added the section to expand the trustee's power to "bring into the estate property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced," ensuring that a broad range of property is included in the estate in order to promote the congressional goal of encouraging reorganizations.  United States v. Whiting Pools, Inc., 462 U.S. 198, 205, 207-08 (1983).

The trustee's claim here, under § 542(a), was limited in nature.  He sought only turnover and an accounting from the McCabes, as well as a restraining order to prevent the McCabes from spending any more estate funds.  Braunstein did not bring a claim

---

[5]     This encompasses items such as cash and property that may be used in the operation of a business, see 11 U.S.C. § 363, as well as real property used as a residence, and certain types of household and personal property of an individual, see id. § 522(d).

[6]     Other provisions of § 542 protect transferors of estate property who act in good faith and without awareness of the filing of the petition, 11 U.S.C. § 542(c), protect good faith transferors who use estate property to pay life insurance premiums in certain circumstances, id. § 542(d), and govern the turnover of recorded information, such as documents, records, or papers, id. § 542(e). See also United States v. Whiting Pools, Inc., 462 U.S. 198, 206 n.12 (1983).

alleging a fraudulent transfer or seek recovery under state law. He did not seek damages from the McCabes.

No statute gives a jury trial right in § 542 turnover actions by the trustee in the district court,[7] and the Bankruptcy Code is silent on the issue.[8] <u>See</u> 28 U.S.C. §§ 157(e), 1411; <u>see also</u> 1 <u>Collier on Bankruptcy</u> ¶ 3.08[1][a] (A.N. Resnick & H.J. Sommer eds., 15th rev. ed. 2009). As a result, McCabe makes a purely constitutional claim under the Seventh Amendment to a jury trial. Three jury trial right decisions from the Supreme Court set the general framework -- <u>Granfinanciera, S.A.</u> v. <u>Nordberg</u>, 492 U.S. 33 (1989), held that a defendant in an action in bankruptcy under § 548 and § 550 to recover a fraudulent transfer has a Seventh Amendment right to a jury trial, and two later jury trial right cases, not in the bankruptcy area: <u>Feltner</u> v. <u>Columbia Pictures Television, Inc.</u>, 523 U.S. 340 (1998), a copyright case, and <u>Markman</u> v. <u>Westview Instruments, Inc.</u>, 517 U.S. 370 (1996), a patent case -- which we describe later.

---

[7]  Our question does not concern whether there is a jury trial right in the bankruptcy court. We note that 28 U.S.C. § 157(e) governs the procedure by which a bankruptcy court may conduct a jury trial if a party is entitled to a jury trial.

[8]  Before engaging in the Seventh Amendment analysis, the court must determine whether it is fairly possible there is a construction of the statute by which the constitutional question may be avoided. <u>Feltner</u> v. <u>Columbia Pictures Television, Inc.</u>, 523 U.S. 340, 345 (1998); <u>see</u> <u>also</u> <u>Visible Sys. Corp.</u> v. <u>Unisys Corp.</u>, 551 F.3d at 65, 78 (1st Cir. 2008).

First, we look to the Supreme Court's several decisions which address the question of a jury trial right in bankruptcy actions. Those decisions shed light on our issue. Granfinanciera held that the Seventh Amendment encompasses "suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." Granfinanciera, 492 U.S. at 41 (quoting Parsons v. Bedford, 28 U.S. (3 Pet.) 433, 447 (1830)) (internal quotation marks omitted). The Court concluded that actions to set aside fraudulent conveyances and preferences have clear analogues in actions brought at law in England in the late 18th century, id. at 43, and involve remedies that are purely legal in nature, id. at 48-49 & n.7.[9]

Granfinanciera, in turn, distinguished Katchen v. Landy, 382 U.S. 323 (1966), as involving powers equitable in nature. See Granfinanciera, 492 U.S. at 57 (stating that Katchen "turned . . .

---

[9] Similarly, in Schoenthal v. Irving Trust Co., 287 U.S. 92 (1932), the Court characterized an action to recover a preference as legal, not equitable. The court noted that in England, litigants brought common-law actions to recover preferential payments. Id. at 94. The court also said such actions are not part of the proceedings in bankruptcy "but concern controversies arising out of it," and could be brought in state courts. Id. at 94-95; see also Granfinanciera, 492 U.S. at 57-58 & n.13 (noting that, under Schoenthal, a jury trial is required in a preference action if the defendant presents no claim in the bankruptcy proceeding, but that the issue is an equitable one if it arises as part of the claims allowance process). Construing the remedy sought, the Court stated the case did not call for an accounting or other equitable relief. Schoenthal, 287 U.S. at 95.

-13-

on the bankruptcy court's having 'actual or constructive possession' of the bankruptcy estate, and its power and obligation to consider objections by the trustee in deciding whether to allow claims against the estate" rather than on the fact that bankruptcy courts are courts of equity because of their summary jurisdiction).[10] Because, in Katchen, the creditor had filed a claim against the estate, thereby submitting to the bankruptcy court's equitable jurisdiction over the claims allowance process, the creditor did not have a jury trial right. See id. at 58 n.13.

In other cases, the court held no jury trial right exists for actions which were part of the broad equitable jurisdiction of the bankruptcy courts. In re Wood, 210 U.S. 246 (1908), holds that no jury trial right exists in actions for disgorgement of excessive fees by counsel because such a claim was within "a special jurisdiction in a bankruptcy proceeding," to allow the court to restore and administer the estate. Id. at 258.

---

[10] The Court had said, in Taubel-Scott-Kitzmiller Co. v. Fox, 264 U.S. 426 (1924), that constructive possession existed, and the bankruptcy court could exercise summary jurisdiction, where:

> [T]he property was in the physical possession of the debtor at the time of the filing of the petition in bankruptcy, but was not delivered by him to the trustee; where the property was delivered to the trustee, but was there after wrongfully withdrawn from his custody; where the property is in the hands of the bankrupt's agent or bailee; where the property is held by some other person who makes no claim to it; and where the property is held by one who makes a claim, but the claim is colorable only.

Id. at 432-33 (footnotes omitted), cited in Katchen, 382 U.S. at 327.

No Supreme Court case directly answers the question of a jury trial right under § 542, so we turn to the guideposts analysis dictated by Granfinanciera, Feltner, and Markman, which establish a three-part test.

First, the court must "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." Granfinanciera, 492 U.S. at 42 (quoting Tull v. United States, 481 U.S. 412, 417 (1987)). The Seventh Amendment "applies to actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century." Id.

Second, the court must "examine the remedy sought and determine whether it is legal or equitable in nature." Id. (quoting Tull, 481 U.S. at 417-18) (internal quotation mark omitted). This stage of the analysis is more important than the first stage. Id.

Third, if the first two factors indicate a party has a jury trial right, the court "must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as factfinder." Id.; see also id. at 42 n.4 (noting that the question

-15-

turns on whether the legal claim at issue is a private or a public right).[11]

Further, the outcome of this analysis is not governed by whether the particular bankruptcy issue is a core proceeding, as a turnover is, 28 U.S.C. § 157(b)(2)(E), or not. See Granfinanciera, 492 U.S. at 36, 41-42.

The turnover claim made in this case by the trustee under § 542(a) is for most of the insurance proceeds paid post-petition to the debtor-in-possession for loss on property, which concededly belongs to the estate. There is no real question that the insurance proceeds were the property of the estate; the turnover issue is whether the debtor-in-possession properly spent down those proceeds in the ordinary course of business under § 363.

We start, then, with history to see if there was a precise action for "turnover" sounding in common law in England before the enactment of the Seventh Amendment, or whether there was, if not precisely a "turnover" action, an analogous action at law. We conclude that there was no common law turnover action and to the extent any analogy may be made (for there was no common law

---

[11] Since Granfinanciera was decided, Congress added 28 U.S.C. § 157(e) to the Bankruptcy Code, which authorizes bankruptcy courts to conduct jury trials in cases where a jury trial right exists, answering many of the questions the third prong of Granfinanciera addresses. See 1 Collier on Bankruptcy, supra, ¶ 3.08[3], at 3-89 to -91; see also, e.g., Pereira v. Farace, 413 F.3d 330, 337 (2d Cir. 2005) (applying Granfinanciera as a two-step test to the analysis of whether a jury right attaches to a trustee's claim for breach of fiduciary duty).

-16-

equivalent) the action was equitable in nature.  We also conclude

that the nature of the remedy is equitable.  Because we decide the

issue under the first two parts of the test, we do not reach the

third part.

1.    History

As noted  by one bankruptcy court in 1990:

> In  18th-century  England  bankruptcy  was
> essentially a creditor's remedy involving the
> equitable  distribution  of  the  bankrupt's
> estate.   Today, the bankruptcy estate  is
> distributed in accordance with the scheme of
> priorities set out in the Bankruptcy Code, and
> the nature of bankruptcy is equity.

Comm. of Unsecured Creditors of N.C. Hosp. Ass'n Trust Fund v.

Mem'l Mission Med. Ctr., Inc. (In re N.C. Hosp. Ass'n Trust Fund),

112 B.R. 759, 762 (Bankr. E.D.N.C. 1990) (citation omitted).[12]  This

observation provides background but does not itself answer the jury

right question under § 542.

The trustee's gathering of the "property" of the estate,

as both that property and the exclusions have been defined by

Congress, is inherently an equitable task.[13]

---

[12]    The first bankruptcy statute in England was enacted in
1543, and by 1624 there were four statutes.  W.J. Jones, The
Foundations of English Bankruptcy: Statutes and Commissions in the
Early Modern Period, Transactions of the Am. Phil. Soc'y, July
1979, at 8, 11.

[13]    In Cuevas-Segarra v. Contreras, 134 F.3d 458 (1st Cir.
1998) (per curiam), this court upheld a bankruptcy court's order
requiring the disgorgement of attorneys fees under 11 U.S.C.
§§ 105(a), 542, and 549.  The Cuevas-Segarra court based its
holding on § 105(a) alone, but described the court's powers under

-17-

Earlier decisions of this court and others so hold. The inherent power in the court to order turnover predated Chapter X of the Bankruptcy Act of 1898 (as amended in 1938), and was present in the earlier reorganization statutes such as § 77B. See United States v. Whiting Pools, Inc., 674 F.2d 144, 150-52 (2d Cir. 1982) (Friendly, J.), aff'd 462 U.S. 198 (1983) (citing Cont'l Ill. Nat'l Bank & Trust Co. of Chi. v. Chi., R.I. & P. Ry. Co., 294 U.S. 648, 675-76 (1935)). The Supreme Court, in Continental Illinois National Bank & Trust Co., described the bankruptcy court's powers generally under the early reorganization statutes as equitable. 294 U.S. at 676 ("[C]ourts of bankruptcy are invested with such authority in equity as will enable them to exercise original jurisdiction in bankruptcy proceedings, including the power to make such orders, issue such process, and enter such judgments in addition to those specifically provided for as may be necessary for the enforcement of the provisions of this act." (internal quotation marks omitted)).

In the 1800s, the Court in Ex parte Christy, 44 U.S. (3 How.) 292 (1845), construed what was effectively a turnover action by an assignee in bankruptcy, proceeding under the Bankruptcy Act of 1841.[14] The assignee sued to recover land that had been in the

all three sections as equitable ones. Id. at 459-60.

[14] Prior to the Bankruptcy Act of 1898, the powers of trustees and debtors-in-possession were exercised by assignees. Bardes v. First Nat'l Bank of Hawarden, Iowa, 178 U.S. 524, 526

debtor's possession when he filed for bankruptcy but that had subsequently been sold by a bank, which held a mortgage on the land. The bank objected that the district court lacked jurisdiction to adjudicate the claim. See id. at 309-10. The Court held that Congress had validly granted the court jurisdiction over such claims, to be exercised in the nature of summary proceedings in equity. Id. at 31-12.

Under the Act of 1898 (as amended in 1938), § 2a(21), the court could authorize receivers to take possession of the property. See 5 Collier on Bankruptcy, supra, ¶ 542.LH, at 542-25. In 1881, the Court in Barton v. Barbour, 104 U.S. 126, 134 (1881), discussed the courts' power to appoint receivers. The Court held that a receiver appointed to operate the business of an insolvent railroad corporation could not be sued without the permission of the court that appointed him. Id. at 127. It based this holding on the fact that the power of the appointing court to manage the estate of the insolvent business and determine the distribution of its assets is an equitable one. Id. at 136. This power, the Court held, included the power to appoint the receiver and to require that the court's consent be obtained before the receiver could be sued. Id.

In Pepper v. Litton, 308 U.S. 295 (1939), the Court discussed the statutory jurisdiction of the bankruptcy courts, and

_____

(1900) ("By the [Bankruptcy Act of 1898] trustees in bankruptcy . . . take the place and are vested with the powers of assignees in bankruptcy under former bankrupt acts.").

-19-

noted that "for many purposes 'courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity.'" Id. at 304 (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 240 (1934)). The Court noted that Congress had given bankruptcy courts a broad range of powers, and said that the courts had "exercised these equitable powers in passing on a wide range of problems arising out of the administration of bankrupt estates." Id. Among the situations the Court listed was the recovery of assets of the estate. Id. at 304 & n.11.[15]

In 1948, in Maggio v. Zeitz, 333 U.S. 56 (1948), the Court discussed in dicta the nature of turnover orders in deciding a case involving constraints on the use of civil contempt powers for failure to comply with a turnover order. The Court noted that:

---

[15] In In re Lilyknit Silk Underwear Co., 73 F.2d 52 (2d Cir. 1934), cited in Pepper, the Second Circuit had held that a trustee could recover funds that had been paid out as dividends under a reorganization plan that was later reversed on appeal. The court acknowledged the "duty of the trustee to gather in all assets belonging to the estate," id. at 53, and held that while there was no statutory provision authorizing the trustee's actions, they were valid, id. at 53-54. The court said:

> One of the basic principles which permeates the act is the duty of the trustee to administer all of the bankrupt's estate, which is not exempt, in accordance with the bankruptcy law. In the exercise of a duty imposed by the bankruptcy law, the trustee may invoke such general equitable principles as are applicable.

Id. at 54; see also Barton, 104 U.S. at 134 ("[I]n cases of bankruptcy, many incidental questions arise in the course of administering the bankrupt estate, which would ordinarily be pure cases at law, and in respect of their facts triable by jury, but, as belonging to the bankruptcy proceedings, they become cases over which the bankruptcy court, which acts as a court of equity, exercises exclusive control.").

> The turnover procedure is one not expressly
> created or regulated by the Bankruptcy Act. It
> is a judicial innovation by which the court
> seeks efficiently and expeditiously to
> accomplish ends prescribed by the statute,
> which, however, left the means largely to
> judicial ingenuity.

Id. at 61. The Court stated, "this procedure is one primarily to get at property rather than to get at a debtor," and noted the theoretical basis for the remedy had a rough analogy to actions to recover possession, but the modern remedy did not follow ancient procedures. Id. at 63. The Court characterized turnover as "essentially a proceeding for restitution." Id. Restitution is an equitable remedy where, as here, the action seeks the recovery of particularly identified property or funds. See Sereboff v. Mid Atl. Med. Servs., Inc., 547 U.S. 356, 363 (2006); see also Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213-14 & n.2 (2002) (noting that the remedy of an accounting of profits is equitable restitution even if the plaintiff cannot identify specific property in the defendant's possession). While some actions which may appear to be in restitution actually sound in law, see, e.g., Todisco v. Verizon Commc'ns, Inc., 497 F.3d 95, 99-100 (1st Cir. 2007), these circumstances are not present here.

In Bank of Marin v. England, 385 U.S. 99 (1966), the Supreme Court held that the exercise of the court's power to compel turnover was subject to equitable constraints, including when there was a lack of notice. It held that funds paid out on a check drawn

-21-

before bankruptcy but not presented for payment until after the filing were not part of the bankruptcy estate and not subject to turnover. The Court noted that "[t]here is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." Id. at 103.

Even before § 542(a) was enacted as part of the 1978 Bankruptcy Reform Act, this court had held that a bankruptcy court had the power to order turnover to reorganization trustees of the debtor's merchandise inventory held in the possession of a creditor, RFC, as a pledge under the debtor's loan agreement. See Reconstruction Fin. Corp. v. Kaplan, 185 F.2d 791 (1st Cir. 1950) (Magruder, J.). This court noted that reorganization cases under Chapter X of the Bankruptcy Act involved broad powers in the court appropriate to accomplish the task of rehabilitation and reorganization of the debtor. Id. at 794 ("In contrast with the provisions of law relating to straight bankruptcy, Chapter X, like its earlier counterpart [§ 77B], contemplates the rehabilitation of financially ailing business corporations under plans of reorganization which may deal with claims of creditors, secured as well as unsecured, and embrace all of the debtor's property, however encumbered with outstanding security interests. In keeping with this objective, appropriate broad powers are conferred upon the reorganization court."). In particular, the turnover process was supported by section 115 of the Act, which provided that the

court would have all the powers "which a court . . . would have if it had appointed a receiver in equity of the property of the debtor."  Id. (quoting Chapter X of the Bankruptcy Act).

The enactment of § 542 as part of the 1978 Bankruptcy Act did not alter the essentially equitable nature of those powers to collect the assets of the estate.  That history is set forth in Judge Friendly's decision in Whiting Pools.  It shows that § 542 was meant to expand the turnover power of the bankruptcy courts in at least two ways: to reach property in the hands of secured creditors and to expand the turnover power beyond reorganization to liquidation cases (as recommended by the National Bankruptcy Conference).  Whiting Pools, 674 F.2d at 153-55.  Secured creditors were given other forms of protection.  Whiting Pools, 462 U.S. at 203-04; see also id. at 207 ("The Bankruptcy Code provides secured creditors various rights, including the right to adequate protection, and these rights replace the protection afforded by possession.").

The McCabes' argument, in response, attempts to draw an analogy between a § 542 turnover action and the common law cause of action for trover or conversion, which would have been tried to a jury.  This argument misconstrues the nature of a § 542 turnover action.  An action for conversion (formerly known as trover) was an action for a forced judicial sale, which allowed recovery in the nature of damages.  See W.P. Keeton et al., Prosser and Keeton on

-23-

the Law of Torts § 15, at 89-90 (5th ed. 1984). Such an action was tried before a jury in the English courts and did not involve equitable remedies such as an accounting. See Granfinanciera, 492 U.S. at 44 (citing 1 G. Glenn, Fraudulent Conveyances and Preferences § 98, at 183-184 (rev. ed. 1940)). Beyond that, the Supreme Court has explicitly rejected the McCabes' analogy to trover, saying the theoretical basis for a turnover remedy is not found in "actions in trespass or trover to recover damages for the withholding or for the value of the property." Maggio, 333 U.S. at 63.

A turnover action is not an action to recover damages for the taking of estate property but an action to recover possession of property belonging to the estate at the time of the filing. See 5 Collier on Bankruptcy, supra, ¶ 542.02. It invokes the court's most basic equitable powers to gather and manage property of the estate.

The McCabes have not proposed any other possible common law analogues for a turnover action. They were not entitled to a jury trial under the first step of the three-pronged analysis.

2.    Remedies

In addition to the historically equitable nature of the turnover powers, the nature of the remedies provided also supports the conclusion that there is no jury trial right.

-24-

The statutory cause of action expressly calls for an accounting remedy, see 11 U.S.C. § 542(a) (stating that an entity holding property of the estate "shall . . . account for such property or the value of such property"), which the Court has recognized is an inherently equitable remedy, see Granfinanciera, 492 U.S. at 49 n.7 (describing an accounting as a "specifically equitable form of relief"); see also Visible Sys. Corp., 551 F.3d at 78. The fact that the statutory action incorporates an accounting remedy is enough to establish that the plaintiff would not, at common law, have had an adequate legal remedy and would have proceeded in equity. See Granfinanciera, 492 U.S. at 47-48.

The Court's decision in Maggio, in discussing turnover, refers to the remedy of restitution. Maggio, 333 U.S. at 63. In Tull v. United States, 481 U.S. 412 (1987), the Court distinguished between actions involving remedies, such as restitution or disgorgement of improper profits, which are "limited to 'restoring the status quo and ordering the return of that which rightfully belongs'" to the plaintiff, id. at 424 (quoting Porter v. Warner Holding Co., 328 U.S. 395, 402 (1946)), from those intended to punish the defendant, id. at 423-24. The former are equitable claims, for which a jury right does not attach, while the latter are legal. Id. at 422; see also Feltner, 523 U.S. at 352 (noting that actions for remedial goals such as compensation and punishment are "traditionally associated with legal relief").

-25-

Further, a court issuing a turnover order has the power to order injunctive relief to allow the trustee to gather the property of the estate. See Reconstruction Fin. Corp., 185 F.2d at 795 (analogizing a turnover order under the statutory precursor to § 542 to an injunction preventing secured creditors from disposing of assets they had seized (citing Cont'l Ill. Nat'l Bank & Trust Co., 294 U.S. at 675)). Such relief is inherently equitable

The McCabes argue that, because the district court's judgment was framed in monetary terms, the remedy was legal, not equitable. That the turnover remedy sought was in the form of monetary relief is not determinative of the jury trial issue. See Chauffeurs, Teamsters, and Helpers, Local No. 391 v. Terry, 494 U.S. 558, 570 (1990) ("This Court has not . . . held that 'any award of monetary relief must necessarily be 'legal' relief.'" (emphasis in original) (quoting Curtis v. Loether, 415 U.S. 189, 196 (1974))). A monetary award may be an equitable remedy when the award is "restitutionary, such as in 'action[s] for disgorgement of improper profits,'" id. (alteration in original) (quoting Tull, 481 U.S. at 424), or when it is "incidental to or intertwined with injunctive relief," id. at 571 (quoting Tull, 481 U.S. at 424) (internal quotation marks omitted). The remedy provided also establishes there is no right to a jury trial.[16]

---

[16]    We do not reach Braunstein's argument that any jury trial rights were waived because the McCabes should be treated as creditors who filed proof of claims. See Langenkamp v. Culp, 498

Finally, our conclusion that there is no jury trial right in a turnover action under § 542 is supported by analogy to court decisions under § 549 of the Bankruptcy Code, under which a trustee may avoid certain post-petition transfers. Courts have held that § 549 actions are equitable rather than legal and do not include a jury trial right.[17]

B.        The Amount Awarded in the Turnover Order

The insurance proceeds for the damage to the Esperaunce were, aside from the houseboat, essentially the sole assets of the estate. The turnover order sought was for the insurance proceeds of $95,230.95, less $17,658.26 for living expenses, or $77,572.69.

_____

U.S. 42, 44 (1990). The argument is based on the fact that McCabe himself is a 1% shareholder of Holdings and Holdings filed a proof of claim. Braunstein does not separately address Karren McCabe, who did not file a proof of claim.

          We also need not reach Braunstein's argument that even if the district court erred in holding the McCabes were not entitled to a jury trial, any error was harmless. See Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 64 (1st Cir. 2000) ("The denial of a jury trial is harmless error if the evidence meets the standard for a directed verdict.").

     [17]     In In re M & L Business Machine Co. v. Youth Benefits Unlimited, Inc. (In re M & L Business Machine Co.), 59 F.3d 1078 (10th Cir. 1995), for example, the Tenth Circuit held that Granfinanciera did not require a jury trial in a trustee's action to recover an unauthorized post-petition transfer of funds to the defendant company. The court held that § 549 is "a provision clearly designed to protect the bankruptcy estate following its inception," that establishes "a procedure which is equitable in nature." Id. at 1082. The court held that there was no underlying legal claim in the case and the jury right did not attach. See id. Like § 549 actions, § 542 turnover actions are designed to protect the property of the estate and establish a procedure by which the court may exercise its equitable powers to gather the property of the estate and administer claims.

-27-

The insurance proceeds were commingled into the McCabes' personal account. The court awarded only $30,262.69, accepting McCabe's argument that $47,310 should not be turned over.

The McCabes argued that the $47,310 costs incurred in towing the Esperaunce and dismantling it for repairs after the wake damage were in the ordinary course of business. See 11 U.S.C. § 363(b)(1); In re Roth Am., Inc., 975 F.2d 949, 952 (3d Cir. 1992).[18] The McCabes did not inquire or seek permission from the court before authorizing the expenditures on the repairs, nor did they give notice under § 363(b). The district court held that the McCabes had ordered the repairs in good faith and that they were made in the ordinary course of business. It did so by analogizing Holdings' business to companies formed to own and operate residential real estate.

Neither party has briefed the standard of appellate review of the district court's decision that the expenditures were in the ordinary course of business. The burden of showing the expenditures were in the ordinary course of business falls on the McCabes. See Aalfs v. Wirum (In re Straightline Invs., Inc.), 525 F.3d 870, 881 (9th Cir. 2008). The amount of the expenditures is not in dispute nor are there disputed factual issues about the

---

[18] The repairs were to accomplish the dismantling of the structural aspects of the boat and their replacement and redesign to address overall water damage. The wake damage did not render the houseboat uninhabitable or in danger of sinking. Rather, because of leakage, there was danger of rot in the superstructure.

reasons for the expenditures. The issue before us is a mixed question of fact and law, invoking a sliding standard of review, tending more toward de novo review at the law end. The district court itself characterized this turnover question as a mixed question of fact and law. The question in this case does not involve the district court's fact-finding function so much as it involves whether the court correctly applied the legal standards to the facts. We conclude it did not, whether we apply de novo review or clear error review.[19]

Section 363 of the Bankruptcy Code states that the trustee, "may use, sell, or lease" property of the estate without notice and a hearing if doing so is "in the ordinary course of business." 11 U.S.C. § 363(b)(1), (c)(1). Section 1107(a) grants debtors-in-possession nearly all of the rights, powers, and duties of a trustee. 11 U.S.C. § 1107(a). These include the trustee's fiduciary duties, see generally Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355-56 (1985), and the statutory requirement to "be accountable for all property received," 11 U.S.C. § 704(a)(2).

---

[19] There is an unusual wrinkle. At the time of the expenditures the petition was for reorganization; by the time of the turnover claim, the petition had been converted to a Chapter 7 liquidation. Giving McCabe the benefit of the doubt that the case was properly a reorganization case, we consider the expenditures in the context of a reorganization.

-29-

In determining whether a transaction satisfies the ordinary course of business test, courts have applied two tests, which reflect the different points of view of the debtor-in-possession or trustee and of the creditors. The first is a horizontal dimension test; the second is a vertical dimension, or "creditor expectation," test. Aalfs, 525 F.3d at 879; see also In re Roth Am., 975 F.2d at 953-53; 3 Collier on Bankruptcy, supra, ¶ 363.03[1]. The First Circuit has little law thus far on this issue; we think the tests are useful. The purpose of both tests is to determine whether a transaction is so out of the ordinary as to entitle creditors to notice and a hearing beforehand. See Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.), 853 F.2d 700, 705 (9th Cir. 1988) ("[S]ome transactions either by their size, nature or both are not within the day-to-day operations of a business and are therefore extraordinary." (quoting Johnston v. First St. Cos. (In re Waterfront Cos., Inc.), 56 B.R. 31, 35 (Bankr. D. Minn. 1985) (internal quotation marks omitted))). The expenditures on the Esperaunce meet neither test; indeed, Holdings had no business at all and this undercuts the premise that it had or could have had ordinary operating expenses.

### 1. Horizontal Test

Under the horizontal test, courts ask "whether, from an industry-wide perspective, the transaction is of the sort commonly

-30-

undertaken by companies in that industry." In re Roth Am., 975 F.2d at 953. This analysis is aimed at determining whether the challenged transaction is abnormal or unusual for the industry. See 3 Collier on Bankruptcy, supra, ¶ 363.03[1], at 363-25; see also Aalfs, 525 F.3d at 881 ("The purpose of the horizontal test is 'to assure that neither the debtor nor the creditor [did] anything abnormal to gain an advantage over other creditors." (alteration in original) (quoting Burlington N. R.R. Co., 853 F.2d at 704)).

First, we disagree with the district court that the analogy for Holdings is to a company which is the commercial owner of residential spaces. The analogy fails. Commercial owners seek to obtain a profit or benefit from their ownership of property which is occupied by others. Holdings' sole residential property was the houseboat, from which it received no income. The purported "rental" payment was no more than a monthly credit to McCabe against his contribution to the purchase price. McCabe admitted on the witness stand that Holdings had no business operations and that Holdings existed to maintain the houseboat so that he and his wife could live on it. He testified that he had no expectation that the estate's creditors would be paid from Holdings' earnings from its operations. Instead, McCabe said, he intended to pay creditors from his own earnings.

The houseboat was not owned or operated in a way common to the commercial real estate industry. Nor were these

expenditures ordinary ones for "repairs."  This was a major dismantling and reconstruction, designed not only to repair but to improve.

2.    <u>Vertical Test</u>

Under the vertical test, courts analyze the challenged transaction from a hypothetical creditor's point of view and ask whether it "subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit." <u>Aalfs</u>, 525 F.3d at 879 (quoting <u>Burlington N. R.R. Co.</u>, 853 F.2d at 705) (internal quotation mark omitted).  The test is intended to "measure[] the types of risks that creditors impliedly agreed to when they extended credit to the debtor" and to determine whether the transaction falls within that range.  3 <u>Collier on Bankruptcy</u>, <u>supra</u>, ¶ 363.03[1], at 363-26.  "The primary focus . . . is on the debtor's pre-petition business practices and conduct," though a court must be aware of changing circumstances.  <u>In re Roth Am.</u>, 975 F.2d at 953.

The transaction fails the creditor expectation test.  The district court found that Holdings' creditors were on notice that the company might enter into this transaction because its operating agreement allowed it to contract with third parties in order to maintain the Esperaunce and because of the natural desire to repair property that has been damaged.  The question the creditor expectation test asks is not whether a transaction is unexpected,

but whether the transaction is ordinary within the context of the debtor/creditor relationship. See Aalfs, 525 F.3d at 880; see also Burlington N. R.R. Co., 853 F.2d at 705. The record discloses no pre-petition activity by Holdings that is comparable to the refurbishment of the Esperaunce. See Aalfs, 525 F.3d at 879-80 (noting that major transactions may fall outside the ordinary course of business if the debtor had not entered into comparable pre-petition transactions); see also In re Roth Am., 975 F.2d at 954.

Moreover, the settlement funds and the Esperaunce were major assets of the debtor. The transaction resulted in the depletion of one asset, the settlement, in a way that decreased the value of the other, the Esperaunce. Cf. Holta v. Zerbetz (In re Anchorage Nautical Tours, Inc.), 145 B.R. 637, 642 (B.A.P. 9th Cir. 1992) (holding that debtors' surrender of a ship was not within the ordinary course of their business because the vessel was a major asset of the debtors). This was not an expenditure within Holdings' day-to-day operations; it was a major transaction and Holdings' creditors were entitled to notice and a hearing.

In a murky argument, the McCabes appear to be asserting that because McCabe commingled the insurance proceeds with his personal assets, he should not be obligated to turnover to the trustee the additional sum of $47,310, but only a smaller sum, even if the expenditures were not in the ordinary course of business.

-33-

The smaller sum, they argue, results from application of the lowest intermediate balance test, described in Connecticut General Life Insurance Co. v. Universal Insurance Co., supra.

That test applies when a debtor in possession "is in possession of property impressed by a trust -- express or constructive" and "the bankrupt estate holds the property subject to the outstanding interest of the beneficiaries." 838 F.2d at 618. No such trust is involved here and the test has no applicability.

C.        The Fourth-Party Complaint Against Attorney Ziady

The McCabes' final challenge is to the district court's orders granting attorney Ziady's motion to dismiss the McCabes' fourth-party complaint for negligent misrepresentation and denying the McCabes' motion for reconsideration of that order and for leave to amend to substitute a claim for detrimental reliance.

We review the court's dismissal de novo, see S.B.T. Holdings, LLC v. Town of Westminster, 547 F.3d 28, 30, 33 (1st Cir. 2008), and the denial of the motion for leave to amend for abuse of discretion, ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 55-56 (1st Cir. 2008).

1.        Negligent Misrepresentation

In general, to establish the elements of a negligent misrepresentation claim under Massachusetts law, a party must show that the defendant "(1) in the course of his business, (2) supplied

false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance on the information, and that he (6) failed to exercise reasonable care or competence in obtaining or communicating the information." Gossels v. Fleet Nat'l Bank, 902 N.E.2d 370, 371-72 (Mass. 2009).

The district court based its dismissal of the fourth-party complaint on a finding that attorney Ziady owed no legal duty to the McCabes. The McCabes argue this was error because their complaint stated all of the Gossels elements, which do not list "duty" among them.

The McCabes are wrong to apply the general law of negligent misrepresentation involving non-attorney defendants, who do not owe legal duties to others, to an attorney defendant. The McCabes' claim is foreclosed by Massachusetts law on negligent misrepresentation claims against attorneys, under Miller v. Mooney, 725 N.E.2d 545 (Mass. 2000). While it is true that under state law "[a]n attorney may owe a duty to a non-client 'who the attorney knows will rely on the services rendered,'" id. at 550 (quoting Robertson v. Gaston Snow & Ely Bartlett, 536 N.E.2d 344, 349-50 (Mass. 1989)), that duty can arise only in certain circumstances not present here. Under state law, this duty will not be imposed if "such an independent duty would potentially conflict with the duty the attorney owes to his or her client." One Nat'l Bank v.

-35-

Antonellis, 80 F.3d 606, 609 (1st Cir. 1996) (quoting Lamare v. Basbanes, 636 N.E.2d 218, 276 (Mass. 1994) (internal quotation mark omitted)). The McCabes are not merely non-clients, they are adversaries of Ziady's client. The positions of the trustee, for whom attorney Ziady worked, were in direct and actual conflict with those of the McCabes, who opposed the turnover order the trustee sought.

Adoption of the McCabes' approach, that the trustee's counsel owed them duties, would conflict with attorney Ziady's duty to the estate as counsel to the trustee. It would also run contrary to the efficient administration of the estate under the federal bankruptcy laws. The McCabes could have easily obtained notice for themselves of the sale, and so it is simply not reasonable to think they would rely on Ziady for notice. Under Fed. R. Bankr. Proc. 9010, a party may appear in the bankruptcy case and, through its attorney's filing of a notice of appearance, receive notices from the court. The Bankruptcy Court's local rules in Massachusetts provide that a party who wishes to receive copies of all notices and pleadings, need only have their attorney "file an appearance with a specific request to be so served" and serve a copy of the request on the trustee or debtor-in-possession and his or her counsel. Bankr. D. Mass. R. 9010-3(c). The McCabes failed to do so.

2.      Detrimental Reliance

The McCabes also argue that the district court abused its discretion in denying their motion to amend the fourth-party complaint to add a claim for detrimental reliance.[20]

This court defers to the district court's denial of a motion for leave to amend if any adequate reason for the decision is apparent in the record. ACA Fin. Guar. Corp., 512 F.3d at 55. Here the record shows that the McCabes' proposed amendment -- to assert a claim against attorney Ziady for promissory estoppel -- would have been futile.

Under Massachusetts law, a plaintiff claiming promissory estoppel must show that the defendant made a promise that he or she intended would be a legally binding commitment. See R.I. Hosp. Trust Nat'l Bank v. Varadian, 647 N.E.2d 1174, 1178-79 (Mass. 1995) ("[A] promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract." (quoting Kuzmeskus v. Pickup Motor Co., 115 N.E.2d 461, 463 (Mass. 1953)) (internal quotation marks omitted)). There is nothing in the record to show that attorney Ziady intended the email legally to bind him to provide notice to the McCabes. See also id. at 1179 (noting a related but independent ground for

---

[20]    The McCabes also argue that the court abused its discretion in denying their motion for reconsideration because the denial was also based on attorney Ziady's owing no legal duty to the McCabes.  The court's ruling was correct.

denying a similar claim -- because there was no promise in the contractual sense, any reliance by the plaintiffs, who were experienced businessmen, would have been unreasonable as a matter of law).

                              III.

The judgment of the district court finding that the McCabes' expenditure of $47,310.00 was made in the ordinary course of business and ordering the McCabes to turn over no more than $30,262.69 is <u>reversed</u>, and the case is remanded for entry of an order that the turnover amount is $77,572.69, with pre-judgment interest in a sum to be determined by the district court. Fed. R. App. P. 37(b). The orders of the district court denying the McCabes' jury trial demand, dismissing the fourth-party complaint against attorney Ziady, and denying the McCabes' motion for reconsideration and for leave to amend are <u>affirmed</u>. Costs are awarded to Joseph Braunstein, Chapter 7 Trustee.