Poole, J.
The defendant in this matter, Richard Lewis (“Lewis”), appeals from a finding for the plaintiff, Michelle Boucher (“Boucher”), and the plaintiff in cross-claim, Greg Sheck (“Sheck”), after a jury-waived trial. The appeal comes before us on the record of the proceedings pursuant to Dist./Mun. Cts. R. A. D. A., Rule 8C.
Boucher brought this action against Lewis and Sheck following renovation work on her home pursuant to a contract between her and Lewis.[1] Lewis filed a counterclaim against Boucher and a cross-claim against Sheck. Sheck cross-claimed against Lewis. Boucher’s amended complaint alleged five causes of action against Lewis: negligence, breach of contract, breach of warranty, violation of G.L.c. 142A, §17, and violation of G.L.c. 93A. Sheck’s cross-claim against Lewis alleged breach of contract.
The trial in this matter began on December 18,2008, and concluded on December 20,2008. After the close of the evidence, Lewis asked for additional time in which to prepare and submit requests for findings of fact and rulings of law. The trial judge *261 denied that request and heard closing arguments. In a Memorandum of Decision on December 22, 2008, the court ordered judgment for Boucher against Lewis, and awarded actual damages in the amount of $150,000.00 on Boucher’s claim pursuant to G.L.c. 93A.[2] The court also entered judgment for Sheck against Lewis, and awarded damages in the amount of $7,233.40. On February 5,2009, the trial judge filed an amended Memorandum of Decision, in which he awarded attorney’s fees to Boucher in the amount of $28,000.00.
Lewis has appealed the judgment for Boucher, asserting that the trial court erred in a number of ways, including: finding Lewis subject to the provisions of G.L.C. 93A; failing to rule explicitly on Boucher’s claims of negligence, breach of contract, breach of warranty, and violation of G.L.c. 142A, §17; failing to find that a purported contractual release presented a defense to Boucher’s action; excluding certain evidence; denying Lewis’s Motion for a Directed Verdict; and awarding damages in an amount unsupported by the record. In addition, Lewis asserts that the trial courfs judgment is contrary to, and against the weight of, the evidence and clearly erroneous, and he contests the trial courts apparent determination of a number of subsidiary factual issues in support of that judgment.
Lewis has also appealed the judgment for Sheck, arguing in his brief that the evidence demonstrated that Lewis acted as Boucher’s agent in hiring Sheck, and that Boucher is therefore liable for any payment due Sheck for his work. In addition, Lewis asserted at oral argument that, because Sheck neither filed a brief nor appeared to argue in this court, the judgment for Sheck should be vacated.
Because the trial judge made no written findings of fact, we recite the facts that the judge could have found based on the trial testimony and exhibits in the record.[3] Boucher met Lewis through her brother, who knew Lewis because they were both Boston Police officers. Boucher initially contacted Lewis to get advice about renovating a two-family house that she owned in South Boston. Boucher sought to remodel the building and convert it into two condominiums in which she and her sister, *262 Donna Murphy, would live.
In March 2005, Boucher, Murphy, and Lewis met to discuss the intended renovations, and, in the course of that meeting, Lewis offered to serve as the general contractor on the project. Lewis told Boucher that he and his brother did construction contracting, and that he was working towards obtaining a home improvement contractor’s license. Lewis told Boucher that he had renovated his own home in South Boston, that he was currently working on a house on his father’s property in Hyde Park, and that he was also then engaged in a construction project on Cape Cod.
At some point after that meeting, Lewis and Boucher agreed that Lewis would act as the general contractor in renovating Boucher’s building, charging Boucher a fee of $20,100, and Lewis presented Boucher with a draft contract. Boucher mentioned to Neil Madden, an attorney who had represented her in a number of matters, that she was converting her two-family home into condominiums. Madden advised Boucher to make sure that all of the people working on the project were insured so that she would not be liable if anyone was injured on the job.[4] When Boucher conveyed that request to Lewis, he drafted a second version of the contract, which included the provision that all “sub-contractors” would be “properly insured.”[5]
Lewis printed that final version of the contract on letterhead reading “RSL CONTRACTING” in large, bold font, next to Lewis’s name and South Boston address. RSL Contracting never existed, and Lewis made up that name and used it on the contract in order to indicate to Boucher that he had more experience as a builder than he actually did.
Paragraph 1 of the contract recited that:
All parties involved (owner Michelle Boucher, Donna Murphy, and all sub-contractors) fully understand that Richard G. Lewis is unlicensed. That is, Richard G. Lewis has no builder’s, general contractor’s, or construction license of any kind.
Following the acknowledgement that Lewis was not licensed, Paragraphs 3 and 4 provided that Lewis was responsible for the duties of a general contractor on the job. Those provisions recited that Lewis would obtain all necessary permits, make sure that all work met code requirements, “hire all licensed ... subcontractors,” schedule all of their work, and pay the subcontractors from funds obtained from Boucher. In addition, Paragraph 2 stipulated that Lewis “will not be held responsible financially or legally for any action associated with the referenced project.” Paragraph 5 recited that “ [t]he owner (s) ... will not be held liable for any injuries incurred on or near the premises by any sub-contractor or employee thereof.”
*263 Lewis also provided Boucher with an estimate for the work to be done, referenced in the contract and setting out a total cost of $114,000.00. That document was on letterhead reading “RSL Broadway Condominiums Association,” a name which Lewis had previously used in business dealings with the tenant in one of the condominiums he owned in South Boston.[6] Included in the estimate was an entry in the amount of $20,100.00, for “general contracting services and fees.”
In May 2005, Lewis hired an architect to draft plans for the renovations. In June 2005, Lewis applied for a building permit for the work. In the section of the application calling for “Contractor Information,” Lewis inserted Thomas Parsons’s name and contractor’s license number in the space for “Licensed Contractor,” and included his own name in the space for “Registered Home Improvement Contractor.”[7]
At some point between the completion of the architectural drawings in May and July 2005, Lewis, Boucher, and Murphy signed the contract.[8] Boucher gave Lewis a check in the amount of $35,000.00, which Boucher made out to “RSL Broadway Condo Association” at Lewis’s direction. In October and November, Boucher gave Lewis two additional $35,000.00 checks made out to the same entity, paying him a total of $105,000.00.
Lewis hired, supervised, and paid all subcontractors who worked on the project, including Parsons and another carpenter, the electrician, the HVAC subcontractor, the flooring installers, construction laborers, and Sheck, who did the plumbing.[9] Lewis began demolition on the building in early August 2005. Boucher communicated frequently with Lewis during the course of construction. She did not discuss the work with any of Lewis’s subcontractors, including Parsons.[10] Other than relaying messages to Boucher from Lewis when he could not reach her during the work day, Murphy did not communicate with Lewis.
As early as September 2005, Boucher had concerns regarding what she considered the poor quality of the work being done. Those concerns grew during the course of the fall. In addition, expenditures on the project substantially exceeded the budget set out in Lewis’s estimate. In late November, Lewis provided Boucher with *264 a list of disbursements up to that point.[11] Boucher had already paid Lewis $105,000.00, and she felt that Lewis was taking advantage of her. Boucher gave an additional $30,000.00 to Madden, her attorney, and she asked Madden to deal with Lewis regarding construction expenses and to disburse money to him as the project went forward. In late December, Lewis provided another written update, in which he indicated that he had expended $102,481.75 as of December 27, and that he required an estimated $53,700.00 in additional funds to complete the project.
Boucher had wanted to move in to her unit before Christmas, and she was upset at the amount of time that the job had taken already, without being finished. There were also substantial problems with the work that had been done, including leaks in the roof, bowed walls, lack of bathroom ventilation, shoddy tile work and flooring, leaking and improperly framed sliding doors, and lack of insulation. Lewis told Boucher that the building’s two boilers had been attached to each other so that only one of the units would be heated, and that he would not separate the two heating systems until she paid him money he felt she owed him at the time.
At some point in late December 2005 or early January 2006, Boucher and Murphy went to the building and found that Lewis had apparently abandoned the job. Lewis had removed the building permit from the premises, doors to both units were open, lumber and other supplies were gone, and there were no tools or indications that anyone was still working there.[12]
Madden met with Lewis several times after Lewis left the project. At trial, Lewis called Madden as a witness and sought to examine him regarding one of those meetings. The trial judge excluded the testimony, and Lewis made an offer of proof. According to the offer of proof, Madden offered to release Lewis from liability if Lewis would accept $2500.00 towards the outstanding balance of his contractor’s fee and repair the roof and a sliding door, and Lewis accepted Madden’s offer. Although Lewis’s attorney asserted in making his offer of proof that Lewis had repaired the roof and door following his acceptance of Madden’s offer, there was no evidence that that work was ever actually done, and Boucher testified to the contrary.[13]
*265 After Lewis stopped working on the job, Boucher hired other contractors to finish the project so that she and Murphy could live in the building. One of those contractors was Timothy O’Brien, a builder whom Boucher called as an expert witness at trial. In his inspection of the building, O’Brien found many instances of defective work by Lewis, including that the stairway to the second floor lacked any support, the rubber roof had been laid on an improper base and was not secured and sealed correctly, the basement stairway and the area around the main water valve were improperly framed, exterior walls lacked insulation and fire stopping materials, one of the sliding doors was installed without a supporting beam above it, the floors were improperly installed, the tile work was defective, interior walls were not constructed correctly, and the bathrooms and dryer were not vented to the outside. O’Brien testified at trial that Lewis had done most of the work so poorly that it would have to be torn out and redone. O’Brien’s “very stingy” estimate of the cost of remedying Lewis’s defective work was $180,000.00.
With respect to Sheck’s cross-claim against Lewis, the trial judge could have found that Lewis hired Sheck to do the plumbing work on the project renovating Boucher’s building, and that Lewis agreed to pay him on a time and materials basis. In all respects, Lewis acted as the general contractor, and Sheck was working for Lewis.[14] As he completed plumbing work, Sheck submitted a number of invoices to Lewis, which Lewis then paid. Sheck properly completed all of the aspects of the plumbing that Lewis directed him to do, and Lewis never complained to him about the quality of any of his work. Sheck submitted two invoices to Lewis in December for work he had performed, totaling $7233.40, but Lewis never paid him on those invoices.
Boucher argues as a preliminary matter that, because Lewis did not submit proposed findings of fact and rulings of law, he failed to preserve any issues for appellate review. See Boston Spine Clinics, Inc. v. Middlesex Insurance Company, 1999 Mass. App. Div. 295, 103 (in appeal pursuant to Dist./Mun. Cts. R. A. D. A., Rule 8C, plaintiff “forfeited any right to ... appellate review” by failing to submit timely requests for rulings of law). The rule which required a party to file requests for rulings, however, Mass. R. Civ. R, Rule 64A, was repealed effective March 1,2008. This case was tried in December 2008, after the date on which the rule was repealed. Accordingly, with one exception discussed below, Lewis is not barred from review of the issues that he argues on appeal. See PERLIN & CONNORS, HANDBOOK OF CIVIL PROCEDURE IN THE MASSACHUSETTS DISTRICT COURT, §12.6, at 361-62 (4th ed. 2009).
The trial judge properly found that Lewis was subject to the provisions of G.L.c. 93A. Section 2(a) of the statute prohibits “unfair or deceptive acts or practices in the conduct of any trade or commerce.” Factors to consider in determining whether a party is engaged in “trade or commerce” include:
the character of the party, the nature of the transaction, the activities engaged in by the party, and whether the transaction was motivated by business or personal reasons.
*266 Barrett v. Massachusetts Insurers Insolvency Fund, 412 Mass. 774, 775-76 (1992). In this case, Lewis represented himself as an experienced builder, who could act as the general contractor on Boucher’s renovation project. The contract between the parties included a $20,100.00 “general contracting” fee for Lewis, and was plainly commercial in nature. Further, Lewis acted as anyone engaged in the business of construction contracting would have: he arranged for plans to be drafted, he obtained a building permit; he hired, supervised, and paid subcontractors; and he dealt with the homeowner regarding design features, progress and quality of the work, and expenditures. There was ample evidence from which the trial judge could have found that Lewis was acting in a business context. See Lantner v. Carson, 374 Mass. 606, 611 (1992). Neither the fact that Lewis was also employed as a Boston Police officer, nor that he met Boucher through her brother, changes the commercial nature of his activities as a contractor.
There was also sufficient evidence to support the judge’s determination that Lewis engaged in conduct prohibited by G.L.c. 93A. First, Lewis violated G.L.C. 142A, §17, which itself constitutes an unfair or deceptive act under G.L.c. 93A. Chapter 142A, §17, applies to “contractors,” which term includes “any person who owns or operates a contracting business who ... undertakes, offers to undertake, putports to have the capacity to undertake, or submits a bid for, residential contracting work.” G.L.c. 142A, §1. The statute defines “residential contracting” as the “renovation ... [of] any preexisting owner occupied building containing at least one but not more than four dwelling units, which building... is designed to be used as a residence.” G.L.c. 142A, §1. Lewis met the statutory definition of “contractor,” and he was therefore subject to the provisions of G.L.c. 142A, §17. There was sufficient evidence that he violated those provisions in several respects, including: operating without a certificate of registration, §17(1); abandoning or failing to perform a project, without justification, §17 (2); and making a material misrepresentation in the procurement of a contract, §17(4). Each one of those violations of the statute was an unfair or deceptive act under G.L.C. 93A, §2(a).
In addition, there was substantial evidence that Lewis engaged in unfair acts in violation of G.L.c. 93A. Conduct is “unfair” for purposes of the statute if it is “(1) within the penumbra of a common law, statutory, or other established concept of unfairness; [or] (2) immoral, unethical, oppressive, or unscrupulous.” Gossels v. Fleet National Bank, 453 Mass. 366, 373 (2009), quoting Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 563 (2008). Lewis violated G.L.c. 93Aby acting unfairly in several respects, including: printing the contract on letterhead falsely indicating that he operated a contracting firm when no such entity existed; informing Boucher that he had configured the building’s boilers so that only one of the units would be heated, and refusing to separate the two heating systems until she paid him; and abandoning the job without notice, taking supplies, and leaving the building unsecured.
Lewis asserts that the trial judge erred in failing to rule explicitly on Boucher’s claims of negligence, breach of contract, breach of warranty, and violation of G.L.c. 142A, §17. First, as discussed in footnote 2, above, the trial court’s Memorandum of Decision may be read to find for Boucher with respect to all of the causes of action asserted in her complaint, and Lewis took no action to seek to clarify any ambiguity in the memorandum. Further, even if the trial court had not ruled on Boucher’s *267 claims other than her claim under G.L.c. 93A, Lewis is not entitled to appellate review on that issue because he did not submit proposed findings of fact and rulings of law before closing arguments. Given that the trial judge was not required to make any rulings of law in those circumstances, see Mass. R. Civ. R, Rule 52(c), Lewis is precluded from appealing the fact that the judge did not do so specifically with respect to the negligence, breach of contract, breach of warranty, and G.L.c. 142A, §17 claims. Moreover, the record in this case demonstrates that there was sufficient evidence for the trial judge to have entered judgment against Lewis on each of those four causes of action.
Lewis also appeals the judgment against him based on Paragraph 2 of the contract, which purports to release him from liability. That paragraph recites that ‘‘Richard G. Lewis will not be held responsible financially or legally for any action associated with the referenced project.” A party who has been induced to enter into a contract as a result of justifiable reliance on a fraudulent or material misrepresentation of fact may void that contract. See McMahon v. M & D Builders, Inc., 360 Mass. 54, 58 (1971); RESTATEMENT 2d: CONTRACTS, §§162,164.
Lewis fraudulently represented to Boucher that he had a contracting company, and that he was an experienced builder who was capable of handling the renovation of her building. When Lewis and Boucher first met, he told her that he and his brother did construction contracting, that he was then handling two projects, and that he was working towards obtaining a home improvement contractor’s license. The contract which contained the release was printed on letterhead reading “RSL Contracting,” an entity which never existed, and the name of which Lewis had made up to use in obtaining the job with Boucher. Lewis induced Boucher to enter into the contract by means of those fraudulent representations, and she justifiably relied on them in doing so. In these circumstances, the contract’s release provision is unenforceable.
In addition, Lewis argues that the trial judge erroneously excluded Madden’s testimony regarding a meeting with Lewis. Lewis made an offer of proof that Madden would testify that, acting for Boucher, he offered to release Lewis from liability if Lewis would accept $2500.00 towards the outstanding balance of his contractor’s fee and repair the leaking roof and a sliding door, and that Lewis accepted Boucher’s offer. Although Lewis asserts in his brief that he then performed by repairing the roof and door, the evidence at trial indicates otherwise. Lewis testified that he asked Dolan to “address” the roof problem and the sliding door, but he was never again on the property himself and he did not testify that the work was actually done. Dolan responded to a leading question by testifying that he “could have” returned to the building to apply a small patch to the roof, but he did not testify that he worked on, or was even asked to repair, the sliding door.[15] In that context, the proffered testimony was properly excluded. See MASSACHUSETTS GUIDE TO EVIDENCE §408 (2011) (offers to compromise inadmissible).
Lewis also asserts that the trial court erred in denying his Motion for a Directed Verdict. Lewis filed his motion for directed verdict when Boucher rested. He then *268 presented evidence, calling four witnesses in his case.[16] Lewis did not renew his motion for directed verdict at the close of all of the evidence.
Lewis failed to preserve that denial for appellate review because he did not renew the motion after he presented evidence. Since this case was tried jury-waived, the motion for directed verdict should be treated as a motion for involuntary dismissal, pursuant to Mass. R. Civ. R, Rule 41 (b) (2). Dew v. Laufauci, 2001 Mass. App. Div. 95, 97. The requirements for preserving appellate rights with respect to motions for directed verdict and motions for involuntary dismissal are the same. Estate of Bryant v. Bryant, 2010 Mass. App. Div. 160, 161. In order to appeal the denial of a motion for involuntary dismissal, the defendant must renew the motion at the close of all the evidence. O’Sullivan v. Shaw’s Supermarkets, Inc., 1997 Mass. App. Div. 1. The only exceptions to the renewal requirement are when the defendant rests without presenting any evidence, Estate of Bryant, 2010 Mass. App. Div. at 162, and when the defendant presents evidence which is “brief’ and “inconsequential.” Lennon v. Durcan-Cuddy Insurance Agency, Inc., 2008 Mass. App. Div. 147, 147-48, citing King v. G & M Realty Corp., 373 Mass. 658, 659 n.3 (1977). Lewis presented evidence in his case which was neither brief nor inconsequential. He called four witnesses whose testimony comprises 56 pages of the trial transcript. Lewis’s failure to renew his motion for involuntary dismissal at the close of all the evidence precludes consideration of its denial.
Lewis argues in addition that the trial court’s judgment is contrary to, and against the weight of, the evidence and clearly erroneous. In his brief, Lewis also challenges a number of factual findings that the trial court necessarily made in support of its judgment.[17] An examination of the record demonstrates ample evidence to support judgment for Boucher. With respect to subsidiary factual findings, the standard of review is not whether the appellate court would have reached the same result as the trial judge, but whether, on the entire evidence, the reviewing court is “left with the definite and firm conviction that a mistake has been committed.” Buster v. George W. Moore, Inc. & M Realty Corp., 438 Mass. 635, 643 (2003) (citations omitted). The trial court’s necessary subsidiary findings were plainly supported by the testimony.
Lewis also challenges the court’s award of actual damages in the amount of $150,000.00, asserting that the figure was speculative and lacked sufficient eviden-tiary basis. The measure of actual damages for unfair or deceptive acts in violation of c. 93A, §2, is the damages incurred which are the “direct results of the [defendant’s] wrong.” Grossman v. Waltham Chemical Co., 14 Mass. App. Ct. 932, 934 (1982) (rescript), quoting Rice v. Price, 340 Mass. 502, 511 (1960). There was substantial support in the evidence for the trial judge’s damages award. O’Brien identified numerous defects in Lewis’s work, and he testified that $180,000.00 was a conservative estimate of the cost of remedying those defects. Lewis’s challenge' to the *269 damages award amounts to no more than a disagreement with the trial judge’s determination of credibility concerning that testimony.
Lewis also argues that the trial judge erred in entering judgment for Sheck on his cross-claim against Lewis. There was sufficient evidence for the judge to find that a contract existed between Lewis and Sheck, that Sheck performed under that agreement, and that Lewis breached the contract by failing to pay for work completed.
Sheck neither filed a brief nor appeared at oral argument in this appeal, and Lewis asserted at the hearing that the judgment for Sheck should therefore be vacated. Under Dist./Mun. Cts. R. A. D. A, Rule 19(c), an appellee who fails to file a brief in the Appellate Division “will not be heard at oral argument, except by permission” of the court. Given Sheck’s failure to file a brief, he was already barred from being heard at the argument pursuant to Rule 19(c). There is no basis for imposing an additional sanction because Shack did not appear for an oral argument at which he would not be heard.
The decision of the trial judge is affirmed.
So ordered.

 Boucher dismissed her complaint against Sheck before trial.

 The memorandum is somewhat ambiguous with respect to the claims on which the court found for Boucher. The memorandum recites that the court entered “JUDGMENT, for the Plaintiff, Michelle Boucher, against the Defendant, Richard Lewis.” The memorandum goes on to award damages, using the following language: “Plaintiff Michelle Boucher is entitled to $150,000.00 in her claim against Richard Lewis. Michelle Boucher... is entitled to actual damages of $150,000.00 for her claim under M.G.L. 93A.” The memorandum of decision thus may be read to indicate either judgment for Boucher on all of her claims, with damages on the other causes of action overlapping those awarded pursuant to G.L.c. 93A, or judgment for Boucher only on her claim under G.L.c. 93A. Lewis did not seek to clarify the court’s ruling by means of a motion to alter or amend the judgment pursuant to Mass. R. Civ. P, Rule 59 (e), or by taking any other action to address the ambiguity that he now asserts as grounds for vacating the judgment.

 A Boston Municipal Court judge is required, where a party has submitted proposed findings and rulings prior to the commencement of closing arguments, to make findings of fact and rulings of law in jury-waived cases. Mass. R. Civ. P., Rule 52(c). Since none of the parties did so in this matter, no findings or rulings were required.

 Boucher told Madden about the planned construction work in passing, and Madden warned her about insurance in the same conversation. Madden never saw the draft or final contract, nor did he provide any formal legal advice to Boucher regarding the matter before she and Lewis executed a contract.

 According to the testimony at trial, the only difference between the executed contract and the draft version was the insertion of that provision in the final version. The draft contract was not introduced in evidence.

 Both the contract and the estimate recited Lewis’s address as 668 East Broadway, South Boston.

 Parsons was a licensed general contractor whom Lewis hired to do framing, roofing, and finished carpentry. Parsons neither met with Boucher, hired or supervised subcontractors, oversaw construction, disbursed any funds, nor otherwise performed any duties of a general contractor on the project.

 Although Murphy did not have any ownership interest in the property at the time that the contract was executed, Lewis’s draft included her as a party, and Lewis insisted that Murphy sign the contract. The building was converted to two condominium units on December 29, 2005.

 At some point after the architect had drafted the plans, Boucher decided that she wanted a higher ceiling than possible in the existing basement. Lewis declined to dig out the basement, and Boucher contracted separately with a basement construction company to do that work.

 Parsons and Boucher both testified at trial that they never met during the construction.

 In addition to other expenditures, the document recited that Lewis had charged $7000.00 as a “GC fee.” The list was printed on letterhead reading “RSL Broadway Condominiums Association.”

 Lewis told Parsons that he was stopping work on the project because Boucher would no longer pay him.

 Lewis testified at trial that, although he never returned to the property himself, he asked Paul Dolan, who did the roofing, framing, and carpentry with Parsons, to go back and “address” a leak in the roof and a problem with the sliding doors. Lewis called Dolan as a witness. In response to Lewis’s attorney’s question, “Did you ever recall going back within the next week or two to do a small patch job on the roof?”, Dolan answered, “I could have, yes.” Dolan then went on to add “I can’t...,” but he stopped when the attorney interjected “Okay.” The attorney then concluded Dolan’s direct examination. Dolan was not asked any questions about the sliding doors, and he did not mention doing any work on them in his testimony. Boucher testified that no one associated with Lewis repaired either the roof or the sliding door, and that she eventually hired a roofing company to fix the leak. According to Boucher, the sliding door still had not been repaired at the time of the trial.

 Sheck had never seen Boucher until the first day of the trial.

 Boucher denied that Lewis repaired either the roof or the door.

 Lewis called a fifth witness, Madden, but he did so before Boucher rested her case and he filed his motion for directed verdict. The trial court permitted Lewis to call Madden during the plaintiff’s case in order to accommodate Madden’s schedule.

 As discussed above, Lewis did not file proposed findings of fact and rulings of law, and the trial court did not make written findings.